Hopwood Plays, Inc., Appellant, *v.* Collin Kemper, as Surviving Partner of the Firm of Wagenhals & Kemper et al., Respondents.

(Argued January 15, 1934; decided February 27, 1934.)

*I. Maurice Wormser* and *Jacob J. Schwebel* for appellant. Defendants failed to prove any of the defenses pleaded in their answer. (*Hudson* v. *Yonkers Fruit Co.*, 258 N. Y. 168; *Farmers' Loan & Trust Co.* v. *Park & Tilford*, 127 Misc. Rep. 59; *Ufa Films, Inc.*, v. *Ufa Eastern Division Distribution, Inc.*, 134 Misc. Rep. 129.) The accounts rendered did not become accounts stated, and plaintiff was not bound by them. (*Rishel* v. *Weil*, 31 Misc. Rep. 70; *Rodkinson* v. *Haecker*, 248 N. Y. 480.)

*Arthur F. Driscoll, George D. Bradford* and *Sidney G. Rosenbloom* for respondents. The defendants were entitled to deduct the expenses that appeared in the statements. (*Hill* v. *Curtis*, 154 App. Div. 662; *Forman* v. *Lumm*, 214 App. Div. 579; *Hayden* v. *Eagleson*, 47 Hun, 639; *Matter of Raymond* v. *Davis*, 248 N. Y. 67; *Vernon Metal & Produce Co.* v. *Joseph*, 241 N. Y. 544; *Underhill* v. *Schenck*, 238 N. Y. 7.) The accounts rendered became accounts stated, and plaintiff was bound by them. (*Rodkinson* v. *Haecker*, 248 N. Y. 480; *Spellman* v. *Muehlfeld*, 166 N. Y. 245; *Stenton* v. *Jerome*, 54 N. Y. 480; *Bruen* v. *Hone*, 2 Barb. 586; *Little* v. *McClain*, 134 App. Div. 197; *Carlisle* v. *Norris*, 144 App. Div. 690.)

POUND, Ch. J. Plaintiff is the successor in interest to Mary Roberts Rinehart and Avery Hopwood, who were joint authors of a play called " The Bat," which had a successful run. They entered into two contracts with a firm of producers, Wagenhals & Kemper, for the production of the play. One was the production agreement. Under the production agreement it was provided that the authors were to receive as their royalties certain graduated percentages of the play's gross box office receipts during its production in first class theatres. After that period of availability expired, so that the play would thereupon

become available for use in stock, repertoire and motion pictures, the authors were to receive, in lieu of the graduated percentages, one-half of the gross receipts to both, that is, one-fourth to each author, and one-half to the producers, less any playbroker's commissions. That clause of the agreement, numbered " fourth," reads: " When the aforesaid dramatic composition becomes available for use in repertoire and stock purposes, as the terms are theatrically understood, the Managers agree to pay to the Co-Authors, and the Co-Authors agree to accept from the Managers, in lieu of the aforesaid royalties, one-half of the sums to be paid for the use of said play to said Managers, less the commission paid to the playbroker who procures such licenses; and the Managers, as producers, shall not be entitled to share in the consideration derived from the use of said dramatic composition for stock and repertoire purposes, unless they will have produced, performed and represented the play in the United States of America and the Dominion of Canada for at least fifty (50) performances, or twenty-five (25) performances in the Borough of Manhattan, City of New York."

The other contract was the so-called " joint venture agreement." The joint venture agreement contained a clause entirely distinguishing the royalties to be paid to the authors under the " authors " agreement, from the authors' interest in the joint venture evidenced by the joint venture agreement. " (d) It is agreed between the parties hereto that the royalties to be paid, to the Co-Authors are separate and distinct from their interest in the enterprise, as evidenced by this agreement, and that the royalties accruing to them shall be paid to them before there be any division of the profits as hereinafter provided." Under the terms of the joint venture agreement during the production of the said play in first class theatres, the authors were entitled to, and did, receive a share of the net profits of the production. Both royalties and net

profits were paid to the authors by the producers from 1920 to 1924. In May, 1924, the play ceased to be produced in first class theatres, and, therefore, according to the provisions of the joint venture contract, the joint venture terminated as of that date. The parties then and there divided whatever surplus remained. The only item remaining was the scenery, which was placed in a storehouse and which was sold in 1926 for $250.

Subsequent to May, 1924, arrangements were made by the producers with the Co-National Play Company, playbrokers, to have the playbrokers procure contracts for the release of the play in stock, for which the brokers were to receive a commission of ten per cent. A play is produced *in stock* after it has ceased to be produced in theatres of the first class; stock performances are usually given in theatres of the second class for which the top price is about one dollar; stock companies pay a fixed weekly amount for the play, usually running from $100 to $300 per week. It is the duty of the playbrokers to collect and account for all the payments, from which they deduct their ten per cent commission, and remit checks monthly to the parties entitled thereto. Such checks were sent monthly to defendants by the playbrokers, but defendants, instead of accounting to the authors for their share monthly, retained such moneys until the end of the year when they accounted for same.

This action is brought to recover about $12,000, which it is claimed the defendants or their predecessors improperly deducted as expenses from the sums due the plaintiff or its predecessors in interest under the production agreement. As appears, one contract provided that the authors were to receive certain percentages of the gross receipts without deduction of expenses. The second contract provided that the authors for a stated sum acquired a one-half interest in the play, and were to receive one-half of the profits without deduction except for brokers' commissions.

The defendants or their predecessors kept an office for taking care of the accounts and certain other matters connected with the production in stock. In this office they employed one man and also paid rentals for storing the costumes of the various stock companies. The expenses arising from these activities they deducted from the amounts remitted as the share of the plaintiff or its predecessors after the expiration of the joint venture agreement.

At the end of each year a remittance by defendants to plaintiff or its predecessors was made, accompanied by a statement showing these deductions of expenses. The statements and remittances were received without question until February, 1930, when the plaintiff wrote objecting to the deduction of expenses.

We think that the complaint was improperly dismissed. No meeting of minds on a new contract was claimed. No legal basis is shown under the contract for deduction of items for attorneys' fees, office supplies, rent and the like. By no construction of the contract is such deduction permissible. (*Brainard* v. *New York Central R. R. Co.*, 242 N. Y. 125.) No room is found for the application of the doctrine of practical construction when in direct conflict with the clear terms of the contract. The question presented is as to what effect temporary acquiescence by silence in the accounts rendered had upon the rights of the parties. Except for such acquiescence, the rights of the parties are not substantially in dispute.

This is not a case of accord and satisfaction. There is no compromise of a dispute nor extinguishment of a liability uncertain in amount. (*Hudson* v. *Yonkers Fruit Co.*, 258 N. Y. 168.) Nor is it a case of estoppel. Estoppel is a conclusive admission, which cannot be denied. A false representation to create an estoppel *in pais* must be a representation of an existing fact acted on before it is corrected. Inadvertent acquiescence in unauthorized deductions or omissions from an account does not in

itself estop the plaintiff from insisting on its due. When the contract is clear in the eye of the law, mutual error does not place the accounting party in the position of having been led to act to its disadvantage. (*Brainard* v. *New York Central R. R. Co., supra,* 133, 134.)

Defendants have not been misled to their injury, nor have they been led to part with any substantial right by rendering inaccurate accounts which have been accepted without protest. They had only to read the contract to see what their duty was. They cannot create a right by mere neglect of duty. Silence which is not prejudicial does not estop. They suffer no loss when they pay what they owe.

Account stated, even when pleaded as a defense or proved on the trial, is not conclusive as a settlement, if mistake or other equitable considerations are shown to impeach it. (*Rodkinson* v. *Haecker,* 248 N. Y. 480, 484, 485; *Hoover* v. *Neill,* 77 W. Va. 470; 11 A. L. R. 575.)

Cases will be found where silence and acquiescence have been held to preclude the parties from questioning items of debit and credit of an account rendered (*Liquidators* v. *Upton Printing Co.,* 152 La. 270), but such cases do not preclude recovery according to the plain terms of an unambiguous contract. (*Norfolk Hosiery, etc., Co.* v. *Westheimer,* 121 Va. 130.)

The judgments should be reversed and a new trial granted, with costs to the appellant to abide the event.

CRANE, LEHMAN, O'BRIEN, HUBBS and CROUCH, JJ., concur; KELLOGG, J., not voting.

Judgments reversed, etc.