**A & P CORRUGATED BOX CORPORATION**

v.

**ST. REGIS PAPER COMPANY.**

Civ. A. No. 52–987.

United States District Court
D. Massachusetts.

Sept. 21, 1955.

Herbert B. Ehrmann, Goulston & Storrs, Marvin Sparrow, Boston, Mass., for plaintiff.

Stuart C. Rand, Choate, Hall & Stewart, Boston, Mass., Rhodes G. Lockwood, Boston, Mass., Horace R. Lamb, LeBouef, Lamb & Leiby, New York City, for defendant.

WYZANSKI, District Judge.

1. Plaintiff is a Pennsylvania corporation manufacturing among other prod-

ucts double-wall corrugated boxes used as containers. The sides of these boxes have two facings of solid liner board between which is inserted corrugated material.

2. Defendant is a New York corporation manufacturing among other products both liner board and corrugated material.

3. Plaintiff's claims relate to alleged breaches by defendant of its contract to deliver liner board. The main claim relates to 38 lb. liner board, the contention being that defendant failed to deliver orders placed by plaintiff pursuant to a written installment contract executed September 12, 1949—or, if that contract is not applicable, to a modification of that contract. A subsidiary claim relates to 42 lb. liner board, the contention being that defendant failed to deliver all the 42 lb. liner board plaintiff ordered in June 1950 pursuant to the aforesaid written contract.

4. Mr. Chase, a local official of defendant's Pepperell Division, and Mr. Vayo, his superior and a New York official in charge of defendant's sales, made contact in the spring of 1949 with Mr. Appel, plaintiff's president. Chase and Vayo sought to sell plaintiff liner board (and also corrugated material which is not the subject of the claims here involved).

5. Defendant's officials explained their company's position. It had not manufactured much liner board. It had at its Pensacola, Florida, plant, paper-making machines of the Fourdriener type, suitable for manufacturing liner board of weights not greater than 42 lb. per 1000 square feet of liner board. It wished to compete against the dominant seller in the market, International Paper Company, and would meet its scale of prices.

6. At that time International Paper was offering at the same price per ton 42 lb. and 38 lb. liner board. Often it made contracts giving its customers express options as to which weights to order. However, there was no usage in that company's contracts, nor in the trade generally, to the effect that where a contract specified a particular weight of liner board the customer could choose at his option another weight.

7. Responding to defendant's invitation, plaintiff placed with it some sample orders in the first half of 1949. Then it submitted for defendant's approval a draft of a contract giving the purchaser an option as to the weights of liner board to be ordered. Defendant rejected the proposal.

8. September 12, 1949, the parties entered into a written installment contract, stated to be governed by the laws of New York. It provided for delivery at defendant's mill over a 36 month period of liner board (as well as corrugating material not here involved). The "basis weight" of the liner board was set forth as "42 pounds per thousand square feet." The "quantity" was fixed at "minimum 18,000 tons, maximum 36,000 tons"; "shipments: 500 tons to 1000 tons per month during the period beginning September 1, 1949 and ending August 31, 1952." "For the quantity of board shipped and sold during the period from September 1, 1949 to September 30, 1949, inclusive the price shall be * * * $100 per 2000 pounds * * * (42 pound) Liner Dry or Water Finish * * thereafter the said prices on liner and corrugating boards of the basis weights above specified, shall be the prices as from time to time announced by the International Paper Company, Southern Kraft Division." "Delivery shall be free on board cars at mill * * * Deliveries hereunder are based upon and subject to the trade customs applicable to the grade or grades of board specified in this contract."

9. During the three year contract period plaintiff placed orders and defendant made shipments as shown in Exhibit M. That table has been accepted by the parties as accurate and reads as follows:

Exhibit M.

## Quantities of Liner Board and Corrugating Board In Tons

### Ordered by A & P and Shipped by St. Regis

### September 1, 1949–August 31, 1952

| Month Ordered | Basis Weight | Quantity Ordered (Tons) | Quantity Shipped (Tons) |
|---|---|---|---|
| **1949** | | | |
| September | 42# | 600 | 611 |
| | 63# | 100 | 100.6 |
| October | 26# | 250 | 250 |
| | 38# | 150 | 157.7 |
| | 42# | 700 | 910.2 |
| November | 38# | 475 | 476.3 |
| | 42# | 475 | 494.7 |
| December | 18# (.007) | 50 | |
| | 26# | 175 | 182.8 |
| | 38# | 300 | 310.9 |
| | 42# | 525 | 539.3 |
| **1950** | | | |
| January | 38# | 300 | 307.9 |
| | 42# | 200 | 198.9 |
| February | 38# | 250 | 263.9 |
| March | 38# | 375 | 390.1 |
| April | 26# | 100 | 103.6 |
| | 38# | 450 | 450.1 |
| | 42# | 450 | 459 |
| May | 26# | 200 | 198.83 |
| | 38# | 150 | 147.2 |
| | 42# | 150 | 150.3 |
| June | 26# | 105 rolls | 105 rolls |
| | 38# | 220 rolls (346.0)* | 138 rolls (220.4)* |
| | 42# | 220 rolls (296.3)* | 120 rolls (178.2)* |
| July | 26# | 200 | 200.5 |
| | 38# | 300 | 310.5 |
| | 42# | 500 | 489.7 |
| August | 26# | 300 | 301.8 |
| | 38# | 215.1 | 215.1 |
| | 42# | 484.9 | 464.2 |
| September | 26# | 160.8 | 160.8 |
| | 38# | 839.2 | 855 |
| October | 38# | 1000 | 603.9 |
| November | 38# | 1000 | 511.1 |
| December | 38# | 1000 | 761 |
| **1951** | | | |
| January | 38# | 1000 | 376.8 |
| February | 38# | 600 | 579.3 |
| March | 38# | 800 | 800.1 |
| April | 38# | 1000 | 988.3 |
| May | 38# | 200 | 197.7 |
| | 42# | 600 | 599.8 |

*Figures in parenthesis represent conversions to tons.

| Month Ordered | Basis Weight | Quantity Ordered (Tons) | Quantity Shipped (Tons) |
|---|---|---|---|
| June | 26# | 250 | 242.2 |
| | 42# | 550 | 554.7 |
| July | 26# | 180 | 183.5 |
| | 42# | 620 | 620.2 |
| August | 26# | 250 | 251.3 |
| | 42# | 750 | 754.9 |
| September | 26# | 200 | 200.8 |
| | 42# | 600 | 603.7 |
| October | 26# | 50 | 49.9 |
| | 42# | 750 | 761.5 |
| November | 26# | 600 | 596.7 |
| December | 26# | 170 | 172.7 |
| | 42# | 30 | 28.5 |
| **1952** | | | |
| January | 26# | 400 | 409.24 |
| | 42# | 200 | 198.5 |
| February | 26# | 400 (200 probably cancelled) | 201.9 |
| | 42# | 300 | 306.4 |
| March | 26# | 50 | 50.8 |
| | 42# | 350 | 359.8 |
| April | 26# | 150 | 147.8 |
| | 42# | 175 | 179.7 |
| May | 26# | 100 | 102.1 |
| | 42# | 150 | 150.4 |
| June | — | — | — |
| July | 26# | 50 | 49.6 |
| | 42# | 100 | 102.3 |
| August | 42# | 50 (50 more may have been ordered) | 101.9 |

10. From Exhibit M it appears that plaintiff often placed orders for, and defendant made shipments of, both 42 lb. and other weight liner board. Defendant's other records are corroborative. They show that defendant honored plaintiff's orders for different weights, defendant allowed plaintiff to alter the weight specified after an order had been placed, and defendant in its books treated all plaintiff's transactions under the same accounting symbol. However, up to October 1950, neither party gave to the other party any express statement whether it regarded the deliveries of weights other than 42 lb. as "under the contract", or "a spot order apart from the contract."

11. Exhibit M also reveals these other facts, which will later be shown to have special significance. In January, February, and March 1950 plaintiff ordered in each month less than 500 tons of liner board. In June 1950 plaintiff ordered 296.3 tons of 42 lb. liner board, but defendant shipped only 178.2 tons pursuant to that order. In each of the four months of October, November, and December 1950 and January 1951 plaintiff ordered 1000 tons of 38 lb. liner board, but defendant shipped pursuant to orders placed in those months re-

spectively only .603.9, 511.1, 761, and 376.8 tons. From September 1950 through April 1951 plaintiff ordered no 42 lb. liner board. From May 1951 through August 1952 plaintiff ordered no 38 lb. liner board but each month ordered only 42 lb. liner board, and defendant filled those orders.

12. On July 14, 1950, after the outbreak of the Korean war, defendant announced to all its customers that "effective today * * * our price on liner board has advanced $10 per ton."

13. Three days later, July 17, when it was aware that International Paper had advanced by only $5 its prices on 42 lb. and 38 lb. liner board, defendant telegraphed plaintiff: "Referring our telegram July 14th price increase amended to read $5 not $10 * * *. Under terms of our liner board contract new price effective August first not July 14th." And in a letter written to plaintiff the same day, defendant explained: "The first telegram was sent last Friday as an over-all policy question of the St. Regis Paper Company and was subject to amendment, of course, based on our liner board contract with you."

14. Defendant applied this lesser increase to both the 38 lb. and the 42 lb. liner board which plaintiff ordered in July, August, and September.

15. In the first fortnight of October, 1950, Mr. Vayo conferred with Mr. Appel. At that time the war had changed the paper market from a buyer's market to a seller's market. Spot orders for liner board could not be placed by a buyer. Both Mr. Vayo and Mr. Appel agree on the following aspects of this conference. Mr. Vayo promised that defendant would continue under its contract to supply at the agreed price 42 lb. liner board. However, Mr. Vayo said he construed the contract as not requiring defendant to honor plaintiff's orders for 38 lb. board. Mr. Appel told Mr. Vayo he made an opposite construction, and referred to what he believed was a trade usage giving the customer an option as to the weight. Mr. Vayo offered to deliver 38 lb. liner board at a $5 premium per ton, and asserted as a justification for the premium that inquiry at defendant's Pensacola mill showed that there was a $5 greater manufacturing cost. Mr. Appel went away to reflect. As he left he planned to place future orders on the 42 lb. basis. But on October 13, 1950, plaintiff wrote defendant, "We have changed our mind and have decided to order .014–38# [38 lb. liner] instead of .016–42# liner [42 lb. liner]."

16. The disagreement between Mr. Appel and Mr. Vayo is whether at the October 1950 conference (a), as Mr. Appel says, defendant offered permanently to amend its contract to give plaintiff a continuing option to buy either 38 lb. or 42 lb. liner under the contract, on the condition that if the order were for 38 lb. plaintiff would pay a premium of $5 per ton, or (b), as Mr. Vayo says, defendant offered to maintain its written contract for 42 lb. liner and, without any definite commitment as to quantities or period of time, to receive only what lawyers would call "ad hoc orders" and what the paper trade calls "spot orders" for 38 lb. liner at a $5 premium. Here is the crux of the case. While the point is not easy, the Court has concluded that plaintiff has not borne the burden of persuasion. In the Court's view both Mr. Appel and Mr. Vayo are trying to tell the truth. The nub of the difficulty is that in their October conference neither spoke clearly or used technical terms. Each from the outset had in mind a different expectation as to the durability of the option for 38 lb. board. Mr. Appel was naturally interested in having as long term an option as possible. He thought the International Paper Company's practice would govern. And from the beginning of the conference, he erroneously had tried by interpretation to assimilate the September 12, 1949, contract to the International contracts. Mr. Vayo, acting in a seller's market, had a natural interest in maintaining his company's flexibility of position. He would not have been tempted to widen defendant's firm long term commitments under

a not noticeably favorable contract. These disparities were never reconciled by any October 1950 manifestation of mutual assent upon the precise point now in controversy. There was never any express or implied agreement upon the period of time and the quantity covered, issues which have now become pivotal. And this failure in October to reach agreement on the durability and extent of the 38 lb. liner option is revealed in the subsequent conduct of the parties. Plaintiff's October 13, 1950, letter indicating that it will take 38 lb. liner fails to state any understanding reached by the parties as to the time or quantity for which defendant has bound itself. Defendant in responding to plaintiff's orders for 1000 tons of 38 lb. liner board, even those placed in the very month of the conference and the three succeeding months when recollection was fresh, regarded itself as uncommitted to fill them in full. In sharp contrast, defendant never treated 42 lb. orders as accommodation matters but as imperative obligations. Even as late as 1952, it punctiliously and fully filled plaintiff's orders for 42 lb. board. In view of all these facts, there is no warrant for finding that in October 1950 the parties modified or amended their 1949 contract.

17. In connection with the 42 lb. liner board the parties agree that, if the whole contract period of 36 months be looked at, more was shipped by defendant than was ordered by plaintiff. The parties also agree that defendant failed by 118.1 tons to fill plaintiff's June 1950 order for 42 lb. liner board, and that that deficiency was never balanced by *later* shipments of 42 lb. board by defendant in excess of plaintiff's orders.

18. If the June 1950 order had been filled in due course, it would have resulted in shipments within two months, that is in August 1950. In August 1950 plaintiff, according to the testimony of its own chief executive officer, Mr. Appel, would have had no difficulty in procuring from the defendant itself an additional 118.1 tons of 42 lb. liner. However, at that time it might have been required by defendant to pay not $100 but $105 per ton. So there may have been some damages flowing from defendant's breach of its agreement to deliver 42 lb. liner board, ordered in June 1950, and this, like other issues of damages, has not been determined at the hearings so far held but has, by agreement of the parties, been left for later hearings or for stipulation.

19. Upon the basis of the foregoing subsidiary findings of fact, the following are the Court's ultimate inferences and determinations of fact, and its conclusions of law.

20. The contract made September 12, 1949, imposed upon defendant no obligation to deliver any 38 lb. liner board. The text of the contract is crystal clear. In the paragraph governing "basis weight" the contract specifies a 42 lb. weight, and again and again in the wording of the various subsequent paragraphs reference is made to the weight theretofore "specified." Such unambiguous limitation was not the result of inadvertence. Defendant had rejected plaintiff's draft proposing that the customer have an option as to the weight of the board ordered from time to time. Defendant expressly adopted certain customs of its competitors and thus by implication rejected other customs. It agreed to accept International Paper's standard of *prices*, but it specified its own weights. It agreed to accept the trade's usages for deliveries but it did not accept any usages governing grades or weights.

21. Another reason why the contract of September 12, 1949, was not made subject to a trade usage permitting customers to select at their option a weight different from that specified is that there is no such usage. Hence there is no factual foundation adequate to invoke the doctrine of cases such as Nicoll v. Pittsvein Coal Co., 2d Cir., 269 F. 968.

22. Since the contract was clear and unambiguous on the point that defendant could be required to furnish

only 42 lb. liner board, the contract could not be stretched to reach 38 lb. board by resorting to an interpretation resulting from the subsequent conduct of the parties. Under the law of New York "No room is found for the application of the doctrine of practical construction when in direct conflict with the clear terms of the contract." Hopwood Plays, Inc., v. Kemper, 263 N.Y. 380, 384, 189 N.E. 461, 463. "If the court finds as matter of law that the contract is unambiguous, evidence of the intention and acts of the parties plays no part in the decision of the case." Brainard v. New York Central R. R. Co., 242 N.Y. 125, 133, 151 N.E. 152, 154, 45 A.L.R. 751. See in accord Gearns v. Commercial Cable Co., 293 N.Y. 105, 109, 56 N.E.2d 67, 153 A.L.R. 813; Restatement, Contracts, § 235(e) and particularly illustration 12 at p. 327, which is strikingly opposite:

"In 1854 A grants to B, a railroad company, a right to make railways through A's land for the term of 1000 years. B in consideration thereof covenants to make a specified payment to A on coal carried over 'any part of its railways' which should be shipped from Port X. For more than 40 years B pays A rent for coal carried over its railway and shipped from Port X only when the coal passes over A's land. Because the language is so clear the words mean that B promises to make the agreed payments on coal shipped over its railroad from Port X though not shipped over A's land."

23. But it is urged by plaintiff that if the September 12, 1949, contract is not open to an *interpretation* that defendant's duty was to respond to orders for 38 lb. board, the contract was subject to a subsequent *modification* to that effect. Plaintiff relies upon the doctrine discussed by Corbin, 3 Contracts § 558 p. 146, and in Comment h. to Restatement, Contracts § 235(e):

"Under the rule stated in this Clause the meaning of the contract cannot be stretched by the acts of the parties beyond what the language will bear. Such conduct of the parties, however, may be evidence of a subsequent modification of their contract."

24. It is unnecessary to consider whether this doctrine of modification is recognized in New York, nor whether if recognized the evidence of modification offered in this case is subject to and satisfies the New York statute of frauds, New York Personal Property Law McKinney's Consol.Laws, c. 41, §§ 31 and 85, nor whether defendant should be allowed to amend its pleadings to present the defense of the statute of frauds. For in this case the evidence, even if admissible, does not show a modification of the contract. The evidence upon which plaintiff relies falls into three principal divisions, dealt with in the three succeeding paragraphs. Taken separately and cumulatively this evidence is not persuasive.

25. In the first year of performance under the contract defendant allowed plaintiff to place orders for 38 lb. liner. But in this early period there were a number of departures from the letter of the contract. Defendant did not insist that plaintiff should order fully 500 tons a month. Defendant allowed plaintiff a discount for prompt cash payment. And so it is reasonable to conclude that defendant's permission to shift orders, defendant's failure to comment upon 38 lb. orders, and defendant's willingness to list all orders, regardless of weight, under the same contract reflect nothing more than a series of accommodations by defendant designed to keep the good will of a new customer in a buyer's market. They were not indicative of a modification of the original agreement. They were not promissory.

26. The telegram and letter of July 17, 1950, treat the 38 lb. liner board as though it came under the September 12, 1949, contract. But such actions did not involve a commitment for the future. They were plain examples of "intrepretations" of a contract and not "modifications" of one. They had no promis-

sory or prospective character. They were not manifestations of an intention to bind defendant for the balance of the 36 month period. They are strictly analogous to the testimony rejected in the Hopwood and Brainard cases cited from the New York courts in paragraph 22 above.

27. In reviewing the October 1950 conference this Court has found as a fact that the parties did not modify their earlier agreement in such a way as to subject defendant to a two year commitment to deliver 38 lb. liner within the tonnage limits set for 42 lb. liner. Nor do the subsequent acts of the parties warrant a finding that there was such a modification.

28. *Ex majore cautela*, the Court adds that the 42 lb. provision was not the type of contractual stipulation which was inserted for the benefit of the customer and was subject to variation by him because it was a matter of indifference to the seller. Here the seller showed its concern about the weight in two ways: first, it rejected a draft providing the customer with an option as to weights; second, it investigated the costs of producing 38 lb. liner at its plants and came up with the report (whether accurate or not) that the increase amounted to $5 per ton.

29. Nor is this a case where plaintiff can successfully assert that defendant, having for so long acquiesced in orders placed for 38 lb. liner, is equitably estopped from rejecting such an order. Defendant did not mislead plaintiff. In October 1950, before rejecting any of plaintiff's orders for 38 lb. liner, defendant stated that in defendant's view such weights were not under the contract and would be filled only at a $5 per ton premium and (according to this Court's findings) only so long as defendant chose.

30. So far as concerns its claim for the 118.1 ton shortage of 42 lb. board in response to its June 1950 order, plaintiff has proved a breach. Each month governed by the contract was treated as separate by the parties both in their agreement and in their conduct. *Earlier* excess deliveries at one price cannot be credited against subsequent shortages at another price. Moreover, shortage in responding to the June 1950 order was a breach which damaged plaintiff. In accordance with the order entered by the Court at the hearing plaintiff should have an opportunity to prove its damages, unless the parties can agree on those damages. Perhaps an agreement on the basis of $5 per ton, or a total of $590.50 (or on some other basis) could be made, such agreement to be contingent on this Court's determinations on the issues of liability not being set aside upon appeal.

31. In the light of the foregoing conclusions, it is unnecessary extensively to rule upon issues of damages relating to the 38 lb. liner board. But, in view of the possibility of reversal upon appeal, this Court deems it appropriate to call to the attention of the parties that, even if plaintiff ultimately prevails, on its 38 lb. claim, the present evidence indicates that the damage plaintiff suffered was not its loss of profits but the additional cost it would have incurred if it had made its containers not out of 38 lb. liner board which defendant failed to supply at $115 per ton, but out of 42 lb. liner board which defendant was prepared to supply at $100 per ton.