294 F.2d 432
 ARMOUR AND COMPANY, Plaintiff-Appellant,
v.
Joseph P. CELIC, J. Dwight Reeve, John Bauer, Thomas White, Albert Topping (first name "Albert" being fictitious, true first name unknown to plaintiff), William A. Zeh, Robert W. Gillespie, Harold E. Goodale and Isadore P. Krupski, Defendants-Appellees.
 No. 374.
 Docket 26852.
 United States Court of Appeals Second Circuit.
 Argued May 4, 1961.
 Decided September 6, 1961.
 
 1
 COPYRIGHT MATERIAL OMITTED Otho S. Bowling, New York City (Bowling & Bowling, New York City, on the brief), for plaintiff-appellant.
 
 
 2
 Reginald C. Smith, Riverhead, N. Y. (Griffing, Smith, Tasker & Lundberg, Riverhead, N. Y., and Sol Gordon, Huntington Station, N. Y., on the brief), for defendants-appellees.
 
 
 3
 Before LUMBARD, Chief Judge, MOORE, Circuit Judge, and STEEL, District Judge.*
 
 
 4
 STEEL, District Judge.
 
 
 5
 Plaintiff, Armour & Company, asserts that on February 1, 1956 it entered into a written contract with Suffolk Farmers Cooperative Association, Inc., of Jamesport, New York. The writing was designated at the top in large letters, "Contract of Limited Agency." It provided that plaintiff would consign to the Cooperative for sale, on commission and for the account of plaintiff, on prices and terms to be fixed by plaintiff, such quantities and brands of fertilizer as might be mutually agreed upon from time to time, that all fertilizer delivered to the Cooperative, until sold, and the cash received by it therefor, should remain the property of plaintiff, that the Cooperative would sell only for cash, and that all cash received by it would be remitted to plaintiff promptly upon demand.
 
 
 6
 On July 3, 1957 the Cooperative, being insolvent, made an assignment for the benefit of creditors. According to plaintiff, the Cooperative then owed plaintiff $46,687.67 which it should have been holding as plaintiff's property and for its account. The assets held by the Cooperative, however, were insufficient to enable it to meet this obligation. Plaintiff charges that the Cooperative converted its property (1) by using $19,777.67 which it received upon the sale of plaintiff's fertilizer for purposes other than payment to plaintiff, and (2) by exchanging $26,910 of fertilizer for produce (or in satisfaction of indebtedness incurred by the Cooperative in purchasing produce) instead of selling the fertilizer for cash as the contract required. Plaintiff brought an action against officers and directors of the Cooperative upon the ground that they were responsible for the conversion and are liable to plaintiff for the $46,687.67 which it lost.
 
 
 7
 The action was dismissed after a trial without a jury. The trial court held as the first ground of its decision that the agreement of consignment never became effective because it was not delivered to the Cooperative after it had been signed by plaintiff. According to the trial court, the fertilizer shipments created a debtor-creditor relationship with the result that the Cooperative held no property of the plaintiff which could be the subject of conversion.
 
 
 8
 The transaction had its inception on January 21, 1956 when representatives of the plaintiff met with the directors of the Cooperative and their counsel and discussed the prospective deal. A copy of the proposed consignment agreement was distributed to the directors and examined by their attorney. On January 27 it was signed by Zeh, the president of Cooperative, and sent to plaintiff for confirmatory execution. Paragraph 14 of the contract stated that it should not be binding upon the plaintiff "until confirmed in writing by one of our [plaintiff's] duly authorized division managers." On February 1, 1956, Post, plaintiff's division manager, signed it.
 
 
 9
 At pretrial the parties stipulated that the instrument was "executed" by plaintiff and the Cooperative under date of February 1, 1956. We should have supposed that this would have put at rest any question concerning the initial effectiveness of the contract. But the trial court was of a contrary view and held "execution" did not encompass delivery; and upon the basis of adequate evidence found that the instrument of February 1, 1956 was never sent to the Cooperative after Post signed it. Relying upon Ross v. Ross, 1931, 233 A.D. 626, 253, N.Y.S. 871; affirmed sub nom., Hutchison v. Ross, 262 N.Y. 381, 187 N.E. 65, 89 A.L.R. 1007, reargument denied, 1933, 262 N.Y. 643, 188 N.E. 102, 89 A.L.R. 1023, it held that the delivery of the agreement to the Cooperative, after its execution by Post, was a prerequisite to its validity. This was basic error.
 
 
 10
 In the absence of some requirement in the contract itself, we know of no principle of law which makes the validity of a contract contingent upon its delivery or the delivery of a copy to one or more of the parties to it. When parties reduce their understanding to writing, express their consent thereto by signing the writing, and the obligations contained in the writing are supported by adequate consideration and are not otherwise illegal, a binding and enforceable agreement results regardless of whether copies are delivered to each of the parties. Ross v. Ross, supra, and other cases which hold that delivery is essential to validity of a deed or trust instrument involve considerations which are without pertinence to ordinary commercial contracts.
 
 
 11
 It may be assumed that the Cooperative was entitled to notice that the contract had been confirmed by plaintiff before the Cooperative could be held to its terms. The evidence, in its entirety, makes it abundantly clear that Cooperative must have understood that plaintiff had done so. Shortly after the contract was confirmed by plaintiff it began to ship fertilizer to the Cooperative. These shipments continued for a year and a half and aggregated in excess of $100,000. The invoices which plaintiff sent to the Cooperative referred to "Agent's Contract" under the designation "Terms." No other "Agent's Contract" except that executed by Post on February 1, 1956 had been entered into by the parties or indeed been discussed by them. On March 2, 1956 the Cooperative distributed a circular saying that Armour & Company had been chosen as its source of supply of fertilizer. All of this justifies the inference that the Cooperative must have known that the contract had been signed on behalf of plaintiff and that the parties were operating under it. Initially, at least, the "Contract of Limited Agency" effectively created a relationship between plaintiff and the Cooperative of principal and agent or consignor and consignee, and definitively set forth the obligations of each.
 
 
 12
 The trial court held, however, that if the February 1, 1956 agreement was initially valid, the parties failed to treat it as a contract of consignment, but acted as if it were a contract of purchase and sale in accordance with a custom which prevailed in the community. Hence the court held that title to the fertilizer passed to the Cooperative upon delivery, and since after delivery plaintiff no longer had a property interest in it, neither the fertilizer nor the cash realized upon its sale could be the subject of conversion. While the court does not say in so many words that the contract of consignment was discharged or abandoned with the mutual consent of the parties in favor of an agreement of purchase and sale, this is what the holding amounts to. The defendants likewise assert in their brief, "The written agreement was abandoned and a new relationship established by the parties."
 
 
 13
 It is axiomatic that the rescission of a contract by abandonment requires mutual assent of the parties. Re Huxley, 1945, 294 N.Y. 146, 61 N.E.2d 419, 169 A.L.R. 194; City of Del Rio v. Ulen Contracting Corp., 5 Cir., 1938, 94 F.2d 701, 704; 6 Corbin, Contracts § 1293 at 147 (1951). The abandonment of a contract can, of course, be inferred from attendant circumstances and conduct of the parties. Brockhurst v. Ryan, 1955, 2 Misc.2d 747, 146 N.Y.S.2d 386, 390 (Sup.Ct.1955); In re Schanzer's Estate, 1959, 7 A.D.2d 275, 182 N.Y.S.2d 475, 479; Restatement, Contracts § 406, comment b (1932). Where conduct is relied upon to establish the abandonment, the acts of the parties must be positive, unequivocal and inconsistent with an intent to be further bound by the contract. City of Del Rio v. Ulen Contracting Corp., supra, 94 F.2d at page 704; Sauder v. Dittmar, 10 Cir., 1941, 118 F.2d 524, 530. The termination of a contract is not presumed, and the burden of establishing it rests upon the party who asserts it. See Arzani v. People, Sup.1956, 149 N.Y.S.2d 38.
 
 
 14
 It is in the light of these principles that the evidence must be examined to ascertain whether the parties by their actions manifested an intention to abandon their rights under the consignment contract. It seems abundantly clear that they did not.
 
 
 15
 Substantially every invoice which plaintiff sent to the Cooperative contained an express reference to "Agent's Contract." The only "Agent's Contract" known to either party was that of February 1, 1956. No objection to this invoice reference was ever voiced by the Cooperative. These circumstances are scarcely consistent with the intention on the part of either party to abandon the consignment contract.
 
 
 16
 Furthermore, in February 1957 when the Cooperative was faced with serious financial difficulties, Albrecht, its credit manager, told two of the directors, Zeh and Reeve, that the Cooperative should set up a special fertilizer account and not commingle the proceeds of the fertilizer sales with its general funds, for otherwise the time might come when the plaintiff could not be paid. Such a "special fertilizer" account was opened on February 25, 1957, the day after Albrecht told Zeh that the Cooperative was approaching insolvency. Thereafter, monies received from the sale of plaintiff's fertilizer and that of two other fertilizer manufacturers were put in the fertilizer account. This fact was known to many of the directors. Thereafter plaintiff was paid by checks marked "Fertilizer Account." Although monies were withdrawn from the account from time to time to meet payrolls and pay creditors, efforts were later made to reimburse the account for these withdrawals. These circumstances pointedly suggest that as late as February 1957 the Cooperative and its officers and directors recognized that a relationship of consignor and consignee existed.
 
 
 17
 The evidence relied upon by defendants to support a contrary conclusion is not convincing. The failure of plaintiff to police the consignment contract by examining the accounts of the Cooperative or by checking its fertilizer inventory does not point in any significant way to an intended relinquishment by plaintiff of its rights under the agreement. Plaintiff's position was not in jeopardy until at least the spring of 1957. At the end of 1956 plaintiff had been paid in full; and on March 6, 1957 its unpaid balance was only $3,545. Under these circumstances, plaintiff's failure to pursue its supervisory rights under its contract cannot be indicative of an intention to abandon it.
 
 
 18
 Defendants claim that plaintiff knew that the Cooperative was paying it with checks drawn upon a general account and that this fact, together with plaintiff's failure to object, indicates that both parties recognized that the consignment contract had been abandoned in favor of a vendor-vendee relationship. This argument, too, is overwrought. The checks which the Cooperative sent to plaintiff (prior to the establishment of the special fertilizer account in February 1957) did not indicate on their face whether they were drawn upon a special or general account. While Post, plaintiff's division manager, admitted that all checks of the Cooperative came over his desk, he denied knowing that they were drawn against general funds or that the Cooperative was not keeping an "in trust" account. The absence of a special account designation was not necessarily meaningful to him. Fertilizer funds could have been kept in one bank and non-fertilizer funds in another. Since the Cooperative had been meeting its obligations to plaintiff, Post was under no duty to question the source from which the payments were being made, under pain of forfeiting plaintiff's rights under the contract.
 
 
 19
 The district court found that the plaintiff knew of and consented to the action of the Cooperative in bartering fertilizer for potatoes. Defendants argue that this was tacit recognition by plaintiff that the provision of the consignment agreement requiring the Cooperative to sell fertilizer only for cash was no longer in effect, that title to the fertilizer was in the Cooperative, and that it was free to deal with it as it pleased. We fail to find any direct evidence, or any attempt by defendants to develop direct evidence, that plaintiff or its employees knew that its fertilizer was being exchanged for produce. The general familiarity which Walter, plaintiff's sales agent on Long Island, had with the Cooperative's business, and his knowledge that a custom of barter prevailed among other wholesalers and the farmers in Suffolk County, was an insufficient evidentiary basis for so precise an inference that Walter knew that the Cooperative was exchanging plaintiff's fertilizer for produce. Since the finding is a secondary or derivative inference and rests upon a flimsy testimonial foundation, if any at all, we are at liberty to disregard it. American Tobacco Co. v. Katingo Hadjipatera, 2 Cir., 194 F.2d 449, 451, certiorari denied 1952, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370.
 
 
 20
 While perhaps some of the billing practices of plaintiff deviated to some extent from the terms of the consignment agreement, by and large they were more consistent with performance of the consignment contract than one of purchase and sale.
 
 
 21
 To establish abandonment it is not enough that the Cooperative intended to deal with the plaintiff on a vendor-vendee basis. A similar intention on the part of plaintiff was essential. Rescission by abandonment requires mutual assent of the parties. To establish abandonment the evidence must be inconsistent with the continuing intention on the part of both parties to do business under the consignment agreement, and point positively and unequivocally to an intention on the part of both parties to abandon it. This is the standard which the law exacts. The evidence, in its totality, does not meet this test. We are satisfied that the parties never mutually intended to abandon the consignment contract. Although there may be some evidence to support a contrary finding by the trial court, upon the basis of the entire record we are left with a definite and firm conviction that no such finding was justified, and was "clearly erroneous." United States v. U. S. Gypsum Co., 1948, 333 U.S. 364, 394-395, 68 S.Ct. 525, 92 L.Ed. 746. There being no oral abandonment of the consignment contract, it is unnecessary to discuss whether such an abandonment would have been effective under New York law. See, generally, Sec. 33-c, New York Personal Property Law; Green v. Doniger, 1949, 300 N.Y. 238, 90 N.E.2d 56; Alcon v. Kinton Realty, Inc., 3d Dept.1956, 2 A.D.2d 454, 156 N.Y.S.2d 439.
 
 
 22
 Defendants next contend that plaintiff is estopped from attacking what the Cooperative did under the consignment contract and invoke the well settled principle that "he who has been silent when in conscience he ought to have spoken, shall be debarred from speaking." Hamlin v. Sears, 1880, 82 N.Y. 327, 332. Defendants assert that the representatives of plaintiff who met with them on January 21, 1956 failed to explain to them that the contract under consideration was a consignment contract. It is said that the representatives told the directors that they would have the same type of contract as other dealers in the locality, and that this meant to the directors that the Cooperative would be authorized to exchange fertilizer for produce since the farmers in the community had always dealt with other dealers on a basis of barter or set-off. Claiming that the directors were misled by plaintiff's silence and affirmative representations at a time when an explicit explanation of the contract terms was called for, defendants argue that plaintiff in equity and good conscience should not now be heard to deny the title of the Cooperative to the fertilizer or its right to deal with it as its own property.
 
 
 23
 What representatives of plaintiff said or failed to say at their meeting with the directors on January 21, 1956 concerning their obligations under the contract cannot bar plaintiff from obtaining the relief to which it would otherwise be entitled. At the meeting copies of the prospective agreement were distributed among the directors. There is testimony that they did not read it. But Hubbard, the Cooperative's attorney, was at the meeting and examined the document. He testified that he knew that it was a consignment contract but that he didn't tell the other directors that it was. The district court correctly held that the directors were chargeable with knowledge of its terms. The directors and their attorney were on notice that the obligations of the Cooperative were to be found within the four corners of the contract regardless of what may have been said prior to its execution. As to this, Section 12 is explicit:
 
 
 24
 "No agreement, not expressed in this contract, shall be binding upon us (the plaintiff), and you (the Cooperative) hereby certify that, at the time you sign this contract, there is no agreement, verbal or otherwise, other than that herein specified."
 
 
 25
 Nor is it of any moment that at the time when the contract was entered into a custom existed on Long Island whereunder fertilizer was exchanged for produce, or that plaintiff was apprised of this custom before the contract was executed. When a contract employs technical words or is ambiguous, an existing custom in the light in which it was entered may be helpful in its interpretation. But in the absence of technical terms or ambiguity, a written contract which clearly sets forth the rights of the parties cannot be varied by custom or practice. Hopwood Plays, Inc. v. Kemper, 1934, 263 N.Y. 380, 189 N.E. 461, 463; Brainard v. New York Cent. R. R., 1926, 242 N.Y. 125, 151 N.E. 152, 154, 45 A.L. R. 751. The agreement of February 1, 1956 must be deemed to mean what it said — that the Cooperative should sell fertilizer only for cash in the absence of a written consent from plaintiff to do otherwise. Such consent was never sought nor given. The exchange of the fertilizer for produce or in satisfaction of claims against the Cooperative for produce sold to it, constituted a wrongful appropriation of plaintiff's property.
 
 
 26
 Other evidence relied upon by defendants to support their estoppel theory is much the same evidence as they have relied upon to support their claim that the contract was abandoned. Our reasons for finding the evidence inadequate to sustain the claim of abandonment likewise deprive it of validity to support a theory of estoppel.
 
 
 27
 Because the district court determined the title to fertilizer passed upon delivery to the Cooperative, it never reached the question whether the defendants should be held liable for the tortious actions of the Cooperative. Since we have concluded that the consignment agreement was originally valid, that it was not abandoned, and that plaintiff is not estopped to assert its rights thereunder, we reach the point where it must be determined whether the defendants should be held responsible for the conversion of plaintiff's property by the Cooperative.
 
 
 28
 Defendants' argument that conversion will not lie because money cannot be the proper subject of conversion requires little consideration. Although the action was cast in terms of conversion, the liability of the defendants need not be pitched on so narrow a ground. If, as we have found, the Cooperative tortiously misappropriated plaintiff's property by disbursing its monies to persons other than plaintiff and by exchanging its fertilizer for produce, then the defendants who are culpably implicated must be held accountable wholly apart from whether their action constitutes a technical conversion.
 
 
 29
 The ordinary doctrine is that a director, merely by reason of his office, is not personally liable for the torts of his corporation; he must be shown to have personally voted for or otherwise participated in them. Phelps Dodge Refining Corp. v. F. T. C., 2 Cir., 1943, 139 F.2d 393, 397. And an officer who disburses funds from a corporation's general banking account in favor of third persons with knowledge that the corporation has deposited in the account funds of the plaintiff which it holds as agent or bailee is liable for plaintiff's loss. Santa Barbara v. Pasquale Avallone & Stefano Miele, 270 N.Y. 1, 199 N.E. 777, reargument denied, 1936, 270 N.Y. 645, 1 N.E. 2d 372. We refer to these cases, not for the purpose of defining the outermost perimeter of the liability of an officer or director for a corporate conversion or to delineate what type of participation is required to render them liable. Our purpose is simply to suggest that as a minimum these are standards by which the conduct of the defendants must be judged. Atlas Assur. Co. v. John L. Dudley, Jr., Co., 1919, 187 A.D. 352, 175 N.Y.S. 549, simply holds that when a plaintiff has consented to the commingling and use of his funds by a corporation prior to the maturing of its obligation to remit the funds to him, he may not hold the directors liable for having authorized such commingling and use. Since the consignment contract before us contained no such consent by plaintiff, the Atlas case is without pertinence to a determination of the defendants' liability.
 
 
 30
 We shall not attempt to review the record to determine which, if any, of the defendants should be held accountable for plaintiff's loss, or in what amount. These are questions which should be determined in the first instance by the trial court by the application of such principles of law as are warranted by the facts which it finds.
 
 
 31
 The judgment will be reversed and the case remanded for further proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 *
 United States District Judge for the District of Delaware, sitting by designation