**CORNING GLASS WORKS, Plaintiff,**

v.

**SOUTHERN NEW ENGLAND TELEPHONE COMPANY, Defendant.**

**No. CIV–85–1549T.**

United States District Court, W.D. New York.

June 2, 1987.

**1000**

Nixon, Hargrave, Devans & Doyle (David M. Lascell, of counsel), Rochester, N.Y., Fish & Neave (Lars I. Kulleseid, W. Edward Bailey, Daniel M. Gantt, of counsel), New York City, Alfred L. Michaelsen, Corning Glass Works, Patent Dept. Corning, N.Y., for plaintiff.

Harris, Beach, Wilcox, Rubin & Levey, Rochester, N.Y., Sidley & Austin (Steven M. Bierman, of counsel), New York City, for defendant.

Harter, Secrest & Emery (Anthony R. Palermo, of counsel), Rochester, N.Y., for 3rd party defendant.

## DECISION and ORDER

TELESCA, District Judge.

### I. INTRODUCTION

Plaintiff Corning Glass Works ("Corning") commenced this action seeking a declaratory judgment that defendant Southern New England Telephone Company ("SNET") is not sublicensed to use certain of Corning's patents relating to the manufacture of optical waveguide fiber ("optical fiber patents"). SNET maintains that it possesses a valid sublicense for the patents in question, asserts affirmative defenses of estoppel and acquiescence, and counter-

claims for interference with business relationships and unfair competition.[1]

Having heard the testimony of the witnesses in this case, and having read the proffered deposition testimony and examined the numerous documentary exhibits, I find that defendant SNET does not possess a valid sublicense to use Corning's optical fiber patents. I further find that SNET's affirmative defenses of estoppel and acquiescence are without merit. Therefore, Corning's request for a declaratory judgment is granted. SNET's counter-claims for interference with business relationships and unfair competition are denied.

## FINDINGS OF FACT

Corning, a New York corporation, is a leading manufacturer of specialty glass materials. Corning holds many of the basic patents relating to optical waveguide fibers, which are hair-thin, solid strands of high quality glass, usually combined in cables for transmitting information in the form of light pulses from one point to another. SNET, a Connecticut corporation, provides telecommunications service in the State of Connecticut, including local and toll telephone service, data transmission, transmission of radio and television programs, and private line voice and teletypewriter services.

SNET's claim to a sublicense in the optical fiber patents is not based on an agreement between SNET and Corning. Rather, SNET's claims are derived from SNET's relationship with the American Telephone and Telegraph Company, Inc. ("AT & T"), and certain patent cross-licensing agreements between Corning and the Western Electric Company, Inc. ("Western"), AT & T's former manufacturing subsidiary. Corning maintains that any rights to the optical fiber patents obtained by SNET pursuant to these agreements were terminated by virtue of the changed relationship between SNET and AT & T mandated by the Modified Final Judgment ("MFJ") entered in *United States v. American Telephone and Telegraph Company, Inc.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Therefore, my findings of fact will discuss: (1) the recent series of events leading to this lawsuit; (2) the evolution of the AT & T–SNET relationship; (3) the 1970 and 1975 patent cross-licensing agreements between Corning and Western/AT & T ("the Western agreements"); and (4) the effect of the MFJ on the AT & T–SNET relationship.

### A. *Events Leading to This Lawsuit*

Raymond Jaeger ("Jaeger") is the President and Chief Executive Officer of SpecTran, a corporation engaged in the manufacture of optical fiber pursuant to patent licenses from both Western and Corning. SpecTran's 1983 license from Corning was limited in terms of geographic scope and quantity. During 1984 and early 1985, Jaeger approached Corning on several occasions seeking a relaxation of the licensing caps. In each instance, Corning refused.

In July, 1984, Corning's general patent counsel, Alfred Michaelsen, informed Jaeger that after the AT & T divestiture, any sales to former Bell Operating Companies would fall within the quantity and geographical restrictions imposed by the license agreement. Michaelsen added that SpecTran could continue to sell to Corning, AT & T, SNET, Cincinnati Bell, or the U.S. Government without regard to those limitations.

Based on this conversation and on inquiries he had made to certain individuals in the patent area of the Bell Laboratories, Jaeger concluded that SNET retained both "have made" rights, and "make" rights for optical fiber under the Western/Corning patent cross-licensing agreements.[2] *See*

---

1. SNET also commenced a third-party action against American Telephone & Telegraph Company ("AT & T"). That action was discontinued with the consent of the parties and by order of this Court dated March 30, 1987. By the terms of that order, SNET may recommence its action against AT & T after the final decision in this action, with leave of this Court and for good cause shown.

2. "Have made" rights would permit SNET to have a manufacturer make optical fiber for SNET's use. "Make" rights would allow SNET to manufacture and sell optical fiber on the open market.

Document entitled "Evolution of Concept" with handwritten notes; *see also* Deposition Transcript of Raymond Jaeger, pp. 593–597. Jaeger investigated the terms of the 1975 Western Agreement between Corning and AT & T/Western. In the following months, Jaeger made separate proposals, first to Cincinnati Bell and then to SNET, to create a joint venture to manufacture optical waveguide fiber using the patent rights Jaeger believed these companies retained by virtue of the 1975 Western Agreement. Cincinnati Bell declined, but SNET was interested in Jaeger's proposal.

Under a cover letter dated January 15, 1985, Jaeger sent SNET a proposal outlining a joint venture between SNET and SpecTran to produce and sell optical fiber worldwide. Under the terms of this proposal, SNET was to make a capital contribution and sublicense the joint venture to use the Corning patents; SpecTran was to provide all other necessary funding, knowledge, and services. The proposal included financial projections which estimated the joint venture would produce net income of $4.7 million for a nine month year in 1985, $12.7 million in 1986, and $15.2 million in 1987. Proposal for Optical Communication Fiber Joint Venture, p. 1.

One of the primary stumbling blocks in the formation of the joint venture was the uncertainty amongst officials at SNET and SpecTran as to the nature and extent of SNET's sublicense for the Corning patents. Jaeger testified that at meetings between SpecTran and SNET officials, the issue of whether SNET had rights under the Western Agreements was discussed. As noted in SNET's Financial Assurance Review of the proposed joint venture, dated May 1, 1985, "Another real risk is the possible judicial proceedings over patents, processes and regulatory issues. The major concern is whether AT & T can extend to SNET patents they use through the cross licensing agreement with Corning Glass." As evidenced by a SNET memorandum dated June 21, 1985, the issue of which party would bear potential liability arising from use of the patents was also discussed during the negotiations. *See also* Update to 6/21/85 Memo on Spectran Contract Negotiations, dated June 27, 1985. On June 7, 1985, the SNET Finance Committee approved the joint venture, provided that the extent of SNET's rights to use the Corning optical fiber patents was clarified. *See* SNET Finance Committee Meeting, minutes dated June 7, 1985; *see also* Approval of Joint Venture Proposal (undated).

SNET officials first informed AT & T of the proposed joint venture, and inquired of AT & T officials as to the nature of SNET's rights.[3] In a letter dated March 15, 1985, James Curtin ("Curtin"), the Vice President and General Counsel of SNET, outlined the structure of the joint venture and listed the patents for which SNET proposed to grant sublicenses. Curtin also requested copies of any relevant patent cross-licensing agreements with Corning, and copies of all relevant patents. AT & T informed SNET that it was licensed under Corning's patents relating to optical fiber devices and other aspects of optical communications systems, and that AT & T's license included the right to grant sublicenses of the same scope to SNET. The patents covered included all Corning patents owned or controlled by Corning, or issued on inventions made by Corning employees, at any time during a five-year period commencing on July 1, 1975 and ending at the close of June 30, 1980. *See* Letters from William L. Keefauver to James B. Curtin, dated May 23, 1985 and June 6, 1985.

Officials at SNET and SpecTran also decided to obtain statements from Corning officials concerning the nature of SNET's rights to the optical fiber patents. However, the primary goal of their actions was not so much to clarify the extent of SNET's rights, but to build a case for SNET's claim that it retained "make" rights which would allow SNET to sublicense the joint venture.

In early June, 1985, SNET placed with SpecTran a $400,000 order for optical fi-

---

**3.** This notification was required under § 1.01 of the 1983 Agreement Concerning Concerning Patents, Technical Information and Copyrights which then governed that aspect of the relationship between SNET and AT & T.

ber.[4] On June 12, 1985, Jaeger contacted Michaelsen, assertedly to verify that Spec-Tran could sell fiber to SNET outside of the quantity restrictions contained in the Corning/SpecTran license. Michaelsen stated it was his belief that SpecTran could make such a sale, but he wanted to verify this opinion. The following day, Michaelsen informed Jaeger by telephone that SpecTran could sell to SNET outside of the license limitations. Jaeger asked Michaelsen for a written confirmation of this opinion. By letter dated June 13, 1985, Michaelsen confirmed that based on Corning's understanding, SNET had a sublicense from AT & T under the AT & T/Corning Patent License Agreement that covered optical waveguide fiber. Therefore, the manufacture and sale of optical fiber by Spec-Tran to SNET would be viewed as occurring outside of the SpecTran/Corning license.

At trial, Jaeger asserted that he requested information from Michaelsen concerning SNET's patent rights in order to protect SpecTran's license with Corning, and to ensure that SpecTran did not make any sales outside the scope of that license in violation of its terms. However, throughout his conversations with Michaelsen, Jaeger declined to inform Michaelsen of the joint venture between SpecTran and SNET. Nor did he inquire as to the existence of SNET's "make" rights.

Following Jaeger's discussions with Michaelsen, Curtin attempted once again to confirm with Corning officials that SNET retained "have made" rights under the 1975 Western Agreement. By letter dated July 5, 1985, Curtin sent William Ughetta, the Vice President and General Counsel of Corning, a copy of a proposed agreement between SNET and SpecTran. Pursuant to this agreement, SNET would grant Spec-Tran the right, pursuant SNET's "have made" rights under the 1975 Western Agreement, to "manufacture exclusively for, and to supply only to, SNET such

Optical Fiber as required by SNET." Once again, no mention was made of the joint venture, nor of SNET's interest in the extent of its "make" rights under the Agreement. Curtin received no response to this letter.

On August 14, 1985, SNET and SpecTran formed SoneTran, a joint venture between the two companies.[5] A public announcement of the joint venture and formation of SoneTran was made the same day. Corning objected to SNET's attempt to grant SoneTran a sublicense for the optical fiber patents. In a telephone conversation with Curtin on August 22, 1985, and in a letter the following day, Michaelson outlined Corning's position. He stated that upon AT & T's divestiture of SNET stock, any sublicense for the optical fiber patents which may have been granted by AT & T to SNET terminated pursuant to Section 6.06(b) of the 1975 Western Agreement. That section provides that any sublicense would terminate when the grantee ceased to be an associated company of AT & T. Therefore, Michaelson stated, SNET had no right to sublicense the joint venture to use the optical fiber patents. This lawsuit ensued.

### B. *The AT & T–SNET Relationship*

Prior to its court-ordered divestiture, AT & T had a number of divisions, including: (1) a long lines division which built and operated long distance lines and interchanges; (2) the Western Electric Corporation, the wholly owned manufacturing arm for the Bell System; (3) the Bell Operating Companies ("BOCs"), a number of companies throughout the United States providing local telephone services; and (4) the Bell Telephone laboratories, research laboratories jointly owned by AT & T and Western.

AT & T and SNET were first associated in 1884 when AT & T acquired one-third of SNET's voting stock in exchange for a

---

**4.** Under the terms of the Corning/SpecTran License Agreement, Corning would have received a royalty of approximately $24,000.00 on an order of this size, had the order been covered by that Agreement.

**5.** SoneTran is technically a subsidiary of SNET, which owns 51% of its shares. SpecTran owns the remaining 49% of the SoneTran shares.

permanent license to use and rent Bell telephones. On June 2, 1930 SNET and Western entered into a Standard Supply Contract ("1930 Supply Contract"), and on January 26, 1931 AT & T and SNET entered into an Agreement Covering Services, Licenses and Privileges ("1931 License Contract"). These agreements followed the same format as the standard license and supply contracts routinely entered into between AT & T/Western and the Bell Operating Companies.

Under the 1931 License Contract, AT & T provided SNET the right to use equipment under patents owned or controlled by AT & T/Western, the benefit of AT & T/Western's research, advice and assistance with respect to virtually all phases of SNET's business, and connections between SNET's telephone system and those of other companies of the Bell System. AT & T also promised to make AT & T/Western patents available for SNET's use, and, if possible, to acquire and render available for SNET's use certain patent rights of others which might be necessary to make an invention or discovery needed for SNET's business available for its use.[6] In return, SNET was required to pay AT & T 2.5% of their total gross earnings.[7] SNET's rights under the agreement were to be perpetual; this agreement governed the relationship between SNET and AT & T until December 31, 1983.

In 1949 the United States filed an anti-trust complaint against Western and AT & T, alleging that they and their operating companies had violated the anti-trust laws. *United States v. Western Electric Co.,* *Inc. and American Telephone and Telegraph Co.,* Civ. Action No. 17–49 (D.N. J.1956). The 1956 Decree placed certain affirmative obligations and restrictions upon AT & T/Western regarding the licensing and sublicensing of its patents. The provisions of this Decree influenced the form and content of the patent cross-licensing agreements subsequently entered into by AT & T/Western.

The Decree directed AT & T/Western to grant licenses for its patents to any applicant, and imposed certain terms and conditions on such licenses. 1956 Decree § X(A). One of the conditions imposed directed that the licenses be granted for the life of the patents licensed, or for a lesser period selected by the grantee. 1956 Decree § X(A). Moreover, licenses granted were to include the right to sublicense the grantee's associated companies for so long as they remained associated companies. 1956 Decree § X(A). AT & T and Western were further enjoined from "granting or receiving any right to grant sublicenses under patents except to the grantee's associated companies for so long as they remain associated companies." 1956 Decree § X(G)(3).

Under the provisions of the 1956 Decree, SNET was considered a "Bell Operating Company" and an "associated company" of AT & T and Western. 1956 Decree §§ II(c), II(j), and Appendix A. Moreover, the Decree restricted SNET's business to the furnishing of common carrier communications services and facilities subject to public regulation, and services and facilities

---

**6.** Paragraph 3 of that Agreement provides in pertinent part, "[T]he Licensor [AT & T] will render available for use by the Associated Companies of the Bell System ... all inventions, discoveries and patents, and all methods and systems covered by patents needed for the said business of the Licensee [SNET] ... and to this end, if any patent rights held by others in any such invention or discovery are necessary to make such invention available for such use, the Licensor will, in case such invention or discovery relates to telephones, acquire the requisite patent rights therein, and, in case such invention or discovery relates to other than telephones, provide suitable arrangements for making the apparatus, appliances, methods and systems embodying such invention or discovery available for use as aforesaid; provided that each such acquisition or arrangement can, in the judgment of the Licensor, be consummated on reasonable terms."

**7.** This arrangement was later modified so that SNET would pay an amount in accordance with SNET's allocated share of total costs (including a return on investment) associated with providing License Contract services, such amount not to exceed ½2.5 of SNET's gross annual income. *See* Letter from John D. deButts to Alfred W. Van Sinderen, dated June 3, 1974.

incidental thereto. 1956 Decree § V.[8] The provisions of the Decree established the general procedures under which SNET operated until December 31, 1983. *See* President's Message, SNET 1974 Annual Report, p. 3.

### C. *The Western Agreements*

The 1956 Decree provided several of the significant terms for all licensing agreements subsequently entered into by AT & T/Western. In 1970, Western and Corning entered into a patent cross-license agreement ("1970 Western Agreement") which governed the relations between Western, Corning, AT & T, and their respective subsidiaries and associated companies.[9] The form and contents of the 1970 Western Agreement were based on Western's standard patent cross-licensing agreement, and incorporated the restrictions found in the 1956 Decree.

Patents covered under the 1970 Western Agreement included all patents for certain products owned or controlled by Corning, Western, AT & T, and their subsidiaries, or issued on inventions made by the employees of such companies, at any time during a five (5) year period commencing on July 1, 1970. 1970 Western Agreement Art. I §§ 1–8. Corning, Western, and AT & T were also entitled to grant sublicenses for the patents covered to their "associated companies". 1970 Western Agreement Art. I § 9(a). Associated companies of AT & T were defined in the Agreement as:

> companies in the United States which are now parties to patent license and service contracts with American relating to the furnishing by them of public communication service by telephone in the United States or between the United States and other countries, the respective subsidiaries of each such company, subsidiaries of AMERICAN other than WESTERN and its subsidiaries....

1970 Western Agreement, Art. VII, § 2(c). Pursuant to this provision, SNET was considered an associated company of AT & T by virtue of the 1931 License Contract between SNET and AT & T. The majority-owned Bell Operating Companies qualified as subsidiaries, and therefore were also associated companies of AT & T under this definition.

However, the grant of sublicenses was limited by Article V § 8(b), which provided in pertinent part, "When an associated company's relationship to a party hereto or AMERICAN changes so that such associated company is no longer an associated company of such party or AMERICAN, any sublicenses granted hereunder to such associated company shall terminate...." Thus, a company would cease to be an associated company of AT & T under the 1970 Western Agreement once it ceased to be a party to patent license and service contracts with AT & T relating to the furnishing by the company of public communications service by telephone.

In 1973 Western modified the terminology of its standard boilerplate cross-licensing agreement. Some of these modifications were undertaken to eliminate certain provisions stemming from the 1956 Decree which were no longer required by the terms of that Decree, such as the requirement that certain patents be licensed on a royalty-free basis. Deposition Transcript of Stanley Rosen, p. 351. Other modifications were aimed at simplifying the boiler plate language of the Agreement. The definition of associated companies of AT & T was changed to simply name those companies, including SNET and Cincinnati Bell, Inc., and their subsidiaries, and the subsidiaries of AT & T other than Western and its subsidiaries. Similarly, the termination provision was modified to provide that sublicenses granted by AT & T and Western

---

**8.** The wording of the Decree limited this restriction to AT & T, Western, and their subsidiaries. However, in 1958 the Federal Communications Commission held that SNET was a telephone subsidiary for purposes of the 1956 Decree. *See Matter of the Connecticut Water Co. v. Wooldridge Bros., Inc.*, 25 F.C.C. 1367, 1375 (1958).

**9.** Western and Corning also entered into a patent cross-licensing agreement in 1963 which contained many of the same terms as the 1970 Agreement. As the important definitions and termination provisions in the two agreements are substantially the same, the 1963 agreement will not be discussed in full.

would terminate if and when the grantee ceased to be an associated company of Western or AT & T.

In 1975, Corning and Western entered into another patent cross-licensing agreement ("1975 Western Agreement"). This Agreement was designed to extend the duration of the 1970 Western Agreement and its terms were reached after limited and cordial negotiations. Under the 1975 Western Agreement, Corning granted to AT & T and Western licenses for products including optical communications systems, optical fiber devices, optical fiber interconnecting apparatus, and optical modulators. 1975 Western Agreement, § 2.02. The licenses granted included rights to "make, have made, use, lease, sell and import" the licensed products. 1975 Western Agreement, § 2.05. Although the Agreement was for a five year period, all licenses granted under the terms of the agreement were to continue for the life of the patent, or for the period during which the grantor had the right to grant such a license. 1975 Western Agreement, § 2.03.[10]

The 1975 Western Agreement followed much the same format and contained many of the same provisions as the 1970 Agreement, with certain modifications derived from the change in the boilerplate provisions made by Western/AT & T in 1973. As in the 1973 boilerplate, the 1975 Western Agreement defined associated companies of AT & T as including SNET, Cincinnati Bell, their subsidiaries, and subsidiaries of AT & T other than Western and its subsidiaries. 1975 Western Agreement, General Definitions Appendix. Similarly, the termination clause provided that any sublicenses granted by Western or AT & T would "terminate if and when the grantee thereof ceases to be an ASSOCIATED COMPANY of WESTERN or AT & T." 1975 Western Agreement § 6.06(b).

### D. The Anti-trust Consent Decree

In a decision which forever changed the nature of the telecommunications industry in the United States, Judge Green approved the terms of an anti-trust Consent Decree which ordered the divestiture by AT & T of the local Bell Operating Companies. *United States v. American Telephone and Telegraph Company*, 552 F.Supp. 131 (D.D.C.1982), *aff'd.* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). This order vacated the 1956 Decree and modified the final judgment in that case.

The purpose of the Modified Final Judgment ("MFJ") and Judge Green's decision was clear. AT & T was to divest all local operating companies, terminate its license and supply contracts and cease its control over the provision of local service. The divestiture was designed to improve competition in three areas: (1) the provision of local telecommunications services; (2) the provision of long distance telecommunications services; and (3) the provision of telecommunications equipment.

Under the terms of the MFJ and the Plan of Reorganization, AT & T was required to terminate the 1930 Supply Contract and the 1931 License Contract between AT & T/Western and SNET. *Id.* at 212–213, n. 339. Moreover, as a result of the MFJ, AT & T determined to divest its 24% interest in SNET. SNET objected to these provisions, maintaining that it was not a party to the Government's anti-trust action, and therefore should not have its relations with AT & T severed. However, Judge Green rejected these arguments, and the MFJ as approved by Judge Green required AT & T to terminate its supply and license contracts with SNET. See *Id.* at 212–213.[11]

When it became clear that AT & T would divest its holdings in SNET and terminate the license and supply contracts with SNET, SNET asserted that they would consider such actions to be a breach of existing AT & T–SNET contracts. Deposition of James Curtin, p. 486–487. SNET and AT & T then entered into a Memorandum of Understanding and Principles of Agree-

---

10. Many of the key patents at issue in this proceeding are due to expire in 1990. *See* Proposal for Optical Communication Fiber Joint Venture, p. 4.

11. Although the discussion in the decision pertains primarily to Cincinnati Bell, it applies with equal force to SNET.

ment which outlined the new AT & T–SNET relationship to be formed after termination of the AT & T–SNET license contract. These principles were designed to afford SNET services and value equivalent to that which they were entitled to receive under the license contract.[12] AT & T proceeded to divest its holdings in SNET, and the 1931 License Contract and the 1930 Supply Contract between AT & T/Western and SNET were terminated on and as the close of business on December 31, 1983. *See* General Agreement Concerning Contractual Relationships Between AT & T and SNET, §§ 2.1.1, 2.4.1, February 8, 1984.

During late 1983 and early 1984, SNET and AT & T entered into a series of 23 replacement contracts which were made retroactive to January 1, 1984. These contracts covered many of the same areas which had been covered under the pre-existing AT & T–SNET License and Supply contracts. One of the replacement contracts was an "Agreement Concerning Patents, Technical Information and Copyrights." By the terms of this agreement, AT & T granted to SNET, "To the extent it has the right to do so ... irrevocable, non-exclusive, personal and royalty-free licenses under ... all patents owned, controlled or licensable by AT & T" as of December 31, 1983. The licenses granted SNET both "make" and "have made" rights under the patents covered. 1983 Agreement Concerning Patents, Technical Information and Copyrights, § 1.01. Moreover, the rights granted to SNET could also be exercised by an affiliate of SNET, provided certain conditions were met. 1983 Agreement Concerning Patents, Technical Information and Copyrights, §§ 4.02, 4.09.

## DISCUSSION and CONCLUSIONS

The evaluation of SNET's claim that it possesses a sublicense for the Corning optical fiber patents requires this Court to address three issues: (1) the meaning of "associated company" of AT & T under the 1975 Western Agreement, and how SNET could lose this status; (2) whether SNET lost this status as a result of the MFJ and AT & T's termination of the 1931 License

Contract and divestiture of SNET stock; and (3) whether Corning is now estopped from denying SNET's sublicense by virtue of certain acts taken by Corning officials.

### A. *"Associated Company of AT & T"*

Under the 1983 AT & T/SNET License Contract, AT & T granted to SNET sublicenses, including both "have made" and "make" rights, for all patents licensable by AT & T as of December 31, 1983. However, this grant was qualified. Recognizing the uncertain nature of its status following the MFJ, AT & T granted sublicenses to SNET only "To the extent it has the right to do so." Whether AT & T possessed the right to sublicense SNET for the Corning optical fiber patents depends primarily upon the terms of the 1975 Western Agreement, which defines AT & T's sublicensing rights with respect to those patents.

The 1975 Western Agreement clearly provides AT & T with the right to sublicense its associated companies for the Corning optical fiber patents. However, the termination section of that Agreement further provides that sublicenses granted by AT & T to its "associated companies" shall terminate if the grantee ceases to be an "associated company". The Agreement defines associated companies of AT & T as including certain named companies, SNET and its subsidiaries among them. However, the 1975 Agreement does not indicate how SNET could lose its status as an associated company. Therein lies the question of contract interpretation and construction for this Court.

The 1975 Western Agreement provides that it is to be governed by the law of the State of New York. Under New York law, where the language of a contract is explicit and unambiguous, a court must interpret the agreement according to the plain meaning of the language used. *See Laba v. Carey*, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641 (1971); *see also, Omaha Indemnity Company v. Johnson & Towers, Inc.*, 599 F.Supp. 215, 218 (E.D.N.

12. Plan of Reorganization, pages 426–427.

Y.1984). It has been SNET's position throughout this case, in its motion for summary judgment and at trial, that the 1975 Western Agreement is unambiguous, that under the plain meaning of the Agreement, SNET is defined as an associated company, and that SNET remains an associated company today.

One important fact appears clearly in the proof at trial, together with the voluminous documentary material offered into evidence. That fact is the uncertainty shared by SNET, AT & T and SpecTran concerning the survival of sublicensing rights originally enjoyed by SNET under the 1975 Western Agreement beyond the effective date of the MFJ. AT & T's uncertainty as to the licensible rights continuing to SNET following the MFJ is eloquently expressed in the limiting clause found in the 1983 Agreement Concerning Patents, Technical Information and Copyrights, which granted rights to SNET "only to the extent it [AT & T] has a right to do so".

■ Based on my reading of the 1975 Western Agreement, I find that it is ambiguous in that it does not define how an associated company of AT & T can lose that status. In interpreting a contract, "the intention of the parties must be gleaned from all corners of the document, rather than sentences or clauses viewed in isolation, and every part of the contract should be interpreted to give effect to its general purpose." *Tougher Heating & Plumbing Company, Inc. v. State,* 73 A.D. 2d 732, 733, 423 N.Y.S.2d 289 (3rd Dept. 1979) (citations omitted); *accord Williams Press, Inc. v. State,* 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (1975). Moreover, the court should try to reconcile all provisions of the agreement and to avoid an interpretation that would leave contractual clauses meaningless. *Two Guys From Harrison—N.Y., Inc. v. S.F.R. Realty Associates,* 63 N.Y.2d 396, 403, 482 N.Y. S.2d 465, 472 N.E.2d 315 (1984); *National Conversion Corp. v. Cedar Building Corp.,* 23 N.Y.2d 621, 625, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969).

Certain provisions of the 1975 Western Agreement describe the rights and responsibilities of companies which acquire or lose "associated company" status during the term of the Agreement. However, the manner in which such status could be acquired or lost by companies like SNET, which were not majority owned, is not found within the Agreement. This omission, coupled with the provisions which envision a termination of such status, render the contract ambiguous. While I recognize that "contractual ambiguity is not established simply because the parties disagree as to the meaning of a particular provision", *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.,* 570 F.Supp. 870, 893 (S.D.N.Y.1983), this is simply not a case in which I may "discern a plain and distinct meaning" by an examination of the contract language alone. *See, id.* at 886.

■ Once a contractual term has been found to be ambiguous, the court's primary object in interpreting the contract is to ascertain and give effect to the intention of the parties. *O'Neil Supply Co. v. Petroleum Heat & Power Co.,* 280 N.Y. 50, 55–56, 19 N.E.2d 676 (1939). The court may examine a variety of factors to determine the intent of the parties. This determination is not governed by the parties' unexpressed subjective views, but rather "by what they wrote, their acts, conduct and all surrounding circumstances." *Lubrication & Maintenance, Inc. v. Union Resources Co., Inc.,* 522 F.Supp. 1078, 1081 (S.D.N.Y. 1981); *Bakas Restaurant, Inc. v. Charos,* 111 A.D.2d 360, 490 N.Y.S.2d 17 (2d Dept. 1985); *Bray Terminals, Inc. v. Grand Union Co.,* 74 A.D.2d 965, 966, 425 N.Y.S.2d 886 (3rd Dept.1980). All prior dealings between the parties, including prior contracts embodying the same terms, are relevant to this inquiry. *See, College Auxiliary Services of State University College at Plattsburg, Inc. v. Slater Corp.,* 90 A.D.2d 893, 894, 456 N.Y.S.2d 512 (3rd Dept.1982) (where there is ambiguity, all dealings between the parties should be considered); *see also, Williams Press, Inc. v. State of New York, supra* 37 N.Y.2d at 440–441, 373 N.Y.S.2d 72, 335 N.E.2d 299 (court examines 1961 contract to determine intention of parties with respect to contracts

from 1965 through 1970). The 1931 License Contract, the 1956 Decree and the 1970 Western Agreement must all be considered in determining how SNET could lose its status as an associated company of AT & T under the 1975 Western Agreement.

The 1931 License Contract established a very special relationship between SNET and AT & T. Under this agreement, SNET was treated as a de facto Bell Operating Company. The relationship between AT & T, Western, the Bell Operating Companies, SNET, and Cincinnati Bell under the system of supply, license and service contracts was almost symbiotic. The Bell Operating Companies, SNET and Cincinnati Bell paid a significant amount of their gross earnings to AT & T. These funds were used in part to fund the research conducted by Western and the Bell Laboratories. As a result, and in return, AT & T had an obligation to obtain rights for all of the Bell Operating Companies; AT & T was obligated to obtain rights for SNET on the same terms. *See* Deposition Transcript of Paul Enlow, pp. 120–121, 129–130; *see also* Trial Transcript of Testimony of Clarence Patti, Retired General Patent Counsel of Corning, pp. 40–41.

The 1956 Decree is relevant to an interpretation of the 1975 Western Agreement because that Decree placed certain legal limitations upon AT & T's rights to enter into patent cross-licensing and sublicensing agreements. *Cf. Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980) (contract is deemed to incorporate all rights conferred upon parties by State law). The provisions relating to associated companies, including the restrictions on the grant of sublicenses, were included in the 1975 Western Agreement for the same reasons they were included in the 1970 Western Agreement—and that was to comply with the restrictions contained in the 1956 Decree and to

carry out AT & T's obligations to SNET under the 1931 License Contract.

The 1956 Decree was an attempt to counteract some of the anti-competitive effects of the relationship between AT & T, Western and the Bell Operating Companies. SNET was included as an associated company in that Decree in recognition of the special relationship it enjoyed with AT & T by virtue of the 1931 License Contract and other agreements. Under that Decree, AT & T was limited in obtaining the right to grant sublicenses to its associated companies.[13]

The limitation on AT & T's sublicensing rights is reflected in the 1970 Western Agreement. The definition of associated companies in that Agreement is designed to track the language of the 1956 Decree. Deposition Transcript of Paul Enlow, p. 128. In the 1970 Western Agreement, "associated companies" of AT & T were defined as:

> companies in the United States which are now parties to patent license and service contracts with AMERICAN relating to the furnishing by them of public communication service by telephone in the United States or between the United States and other countries, the respective subsidiaries of each such company, subsidiaries of AMERICAN other than WESTERN and its subsidiaries....

1970 Western Agreement, Article VII § 2(c). SNET qualified as an associated company of AT & T under this definition by virtue of the 1931 License Contract.

The 1975 Western Agreement simplifies the definition of associated companies by refering to subsidiaries of AT & T. Although SNET was an associated company under the 1956 Decree, it was not a subsidiary as that term was defined in the 1975 Western Agreement. As a result, SNET

---

13. Under § X(G)(3), of the 1956 Decree, Western and AT & T were enjoined from "granting or receiving any right to grant sublicenses under patents except to the grantee's associated companies for so long as they remain associated companies." Under this provision, when AT & T/Western granted Corning the right to sublicense AT & T/Western patents, that right had to

be restricted to Corning's associated companies. AT & T was similarly restricted from "receiving any right to grant sublicenses ... except to the grantee's [AT & T's] associated companies for so long as they remain associated companies." Thus, any sublicensing right AT & T received from Corning had to be similarly restricted.

was simply named in the 1975 Western Agreement as an associated company.[14] *See* Deposition Transcript of Stanley Rosen, Patent Attorney for AT & T, pp. 336–337; *see also* Deposition Transcript of Paul Enlow, pp. 128–129.

■ Therefore, SNET's status as an associated company of AT & T under the 1975 Western Agreement was dependent upon the continuation of the special relationship engendered by the 1931 License Contract. The restrictions contained in the 1956 Decree were designed to address, in some small degree, the problems created by that relationship, and the termination provisions in the Western Agreements were designed to comply with the restrictions in the Decree. In any event, the special relationship which made SNET an associated company of AT & T continued until December 31, 1983. *United States v. AT & T, supra* at 212, n. 339.

## B. *The Effect of the MFJ*

Pursuant to the MFJ and the Plan of Reorganization, AT & T terminated its license and supply contracts with SNET. Although the terms of the MFJ did not require it to do so, AT & T also divested its 28% interest in SNET's stock. These actions dramatically altered the relationship between AT & T and SNET, and I find that once these acts were taken, SNET ceased to be an associated company of AT & T under the provisions of the 1975 Western Agreement.

The purpose of the MFJ was to alter the relationship between AT & T and the Bell Operating Companies, SNET and Cincinnati Bell. The MFJ of course accomplished divestiture. That is, AT & T lost the control over the Bell Operating Companies and the associated companies that it had previously enjoyed. The intent was to create independent economic units and to encourage competition. The relationship between AT & T and SNET was forever changed. The 1931 License Contract was terminated. SNET stopped paying a percentage of its gross income to AT & T, and AT & T was no longer obligated to acquire certain patent rights for SNET.[15]

SNET has argued, quite forcefully, that by entering into the 23 replacement contracts AT & T and SNET maintained their relationship, and that SNET remains an associated company of AT & T under the terms of the 1975 Western Agreement.[16]

---

**14.** The evidence showed that the 1975 Western Agreement was designed to extend the term of the 1970 Western Agreement. Deposition Transcript of Quenton W. Wiest, pp. 268–269. Although the 1975 Western Agreement defines certain associated companies of AT & T by simply naming those companies, this definitional change resulted from a desire to simplify the contractual language. Deposition Transcript of Stanley Rosen, p. 350. The definition was first changed in 1973, when AT & T revised the boilerplate provisions of its standard patent cross-licensing agreement.

The definition of "associated companies" in the 1970 Western Agreement, which focused on the existence of patent license and service contracts, had created difficulties for AT & T in the negotiation of patent cross-licensing agreements. Many potential cross-licensees recognized that AT & T had numerous patent license agreements, and frequently did not understand what a service contract was. As a result, there was concern that if they licensed their patents to AT & T, then AT & T could automatically sublicense them to anyone who had a patent license with AT & T. However, such a broad grant was never intended by AT & T. Deposition Transcript of Paul Enlow, former General Patent Counsel of AT & T, pp. 93–94. AT & T wanted only to comply with the provisions of the 1956 Decree.

**15.** Although counsel for SNET argued in his summation that Judge Green stated in his decision that the proposed Consent Decree did not affect "existing licensing contracts, most of which last for the life of the patent," *United States v. American Telephone and Telegraph Company, supra,* 552 F.Supp. at 176 n. 188, that portion of the decision does not apply to the situation at hand. That footnote means only that SNET retains any licensing rights it may have had in *AT & T's own patents* prior to the entry of the Consent Decree. While AT & T received a license in the Corning optical fiber patents for the life of those patents, AT & T's right to grant a sublicense to SNET for the same patents was dependent upon SNET's retaining its status as an associated company of AT & T.

**16.** While the 1975 Western Agreement provides that a company can gain associated status during the five-year term of that Agreement, the term has expired. When SNET's status as an associated company was lost in 1983, its sublicense rights ceased, and those rights could not be regained after the term of the 1975 Western Agreement lapsed.

While I agree that SNET and AT & T do remain associated in a certain sense, I find that it is not the same relationship which existed prior to the implementation of the MFJ.

While the replacement contracts were designed to provide SNET with "value equivalent" to what they previously had, value equivalent does not mean an identical relationship. The relationship engendered by the replacement contracts is a mutation of the relationship previously existing between AT & T and SNET. A company could not gain associated company status under the 1970 and 1975 Western Agreements by entering into any typical patent license contract with AT & T. A special type of relationship was embodied in the 1930 Supply Contract and the 1931 License Contract—a relationship which SNET and AT & T could not recreate. The terms of the MFJ forbid it. Had AT & T and SNET instituted the same relationship, they would have violated the heart, if not the letter of the MFJ.

The MFJ did not direct that the Bell Operating Companies would be totally cut off from AT & T, or that they would lose all rights they had had in AT & T's patents (rights which they had paid for through the funding of the Bell Research Laboratories). The MFJ required AT & T to provide the Bell Operating Companies with certain patent rights, continuing technical assistance and information. SNET was to receive the same rights to *AT & T patents* as was provided to the Bell Operating Companies after divestiture. *See* Memorandum of Understanding and Principles of Agreement, § V.

■ However, the MFJ clearly required that the ongoing and future relationship between AT & T and SNET be changed. This change meant that SNET ceased to be an associated company of AT & T under the terms of the 1975 Western Agreement. Therefore, AT & T had no right, when it executed the 1983 Agreement with SNET, to grant SNET a sublicense in the Corning optical fiber patents. AT & T's right to grant a sublicense in the Corning patents terminated when SNET ceased to be an

associated company of AT & T, and this termination occurred at the moment the 1931 License Contract between SNET and AT & T was terminated and the MFJ became effective.

If the original patent licensing agreement between Corning Glass and AT & T had not contained the provision limiting sublicensing to associated companies for so long as they remained associated companies, then AT & T would have the right to afford SNET unrestricted use of the patents in question. Once SNET was no longer an associated company of AT & T, AT & T could no longer grant SNET a sublicense for the Corning optical fiber patents. Such a grant would require Corning's approval.

■ SNET's rights as an associated company under the 1975 Western Agreement terminated as a matter of law on December 31, 1983, when the 1931 License Contract and other agreements were terminated, and the MFJ became effective. The opinions expressed by counsel for Corning and AT & T concerning the existence of SNET's rights were erroneous. Subsequent to December 31, 1983, SNET can only enjoy rights in the Corning optical fiber patents by separate grant of license from Corning because it is no longer "associated" with AT & T in the sense contemplated by Corning and AT & T when the license was originally granted.

## C. SNET's Defenses

SNET has asserted defenses of estoppel and acquiescence which I find are without merit. SNET's order for optical fiber from SpecTran, and the ensuing discussions between Jaeger and Michaelsen, were undertaken pursuant to a calculated scheme by officials of SpecTran and SNET to bootstrap SNET's claim to a sublicense by eliciting statements to that effect from Corning officials. SNET's June, 1985 order was the first order of optical fiber they had ever given to SpecTran. Deposition Transcript of Raymond Jaeger, p. 616. Moreover, the size of the order, and the low royalty payment that would have been due Corning had the order been found to come under the Corning/SpecTran license, were

designed to elicit an opinion from Corning officials without substantial and thorough investigation as to the exact nature of SNET's rights.

Although Jaeger testified at trial that he had not informed Corning of the planned joint venture because he felt that such a disclosure would have required him to make a public disclosure due to SpecTran's upcoming stock offering, his testimony on this point, and on other points, was simply not credible.

Curtin's letter to Ughetta, dated July 5, 1985, was similarly prompted by a desire to bolster SNET's case. As was revealed in the testimony and documentary evidence, officials at SpecTran and SNET agreed to make inquiries of Corning officials as to the nature of SNET's "have made" rights, to wait an appropriate period of time thereafter, and then to proceed with the joint venture. As one SNET official noted, "If Corning doesn't act we go ahead on basis that their silence is concurrence, or if they act later we have a case we think we can win." Update to 6/21/85 Memo on Spec-tran Contract Negotiations, dated June 27, 1985; *see also* Deposition Transcript of Richard Donofrio, p. 564. There was a conscious decision on the part of officials at both SpecTran and SNET that Corning would not be informed of the joint venture. Deposition Transcript of James Curtin, p. 461.

The statements made by Michaelson concerning the existence of SNET's "have made" rights under the 1975 Western Agreement and Corning's failure to respond to Curtin's letter of July 5, 1985, do not estop Corning from now asserting that SNET does not possess "have made" or "make" rights under that Agreement. Estoppel is an equitable remedy requiring the party charging estoppel to have clean hands. *Cf. Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 874 (E.D.N.Y. 1978) (specific performance); *Cf. Pecorella v. Greater Buffalo Press, Inc.*, 107 A.D.2d 1064, 1065, 486 N.Y.S.2d 562 (4th Dept. 1985) (party seeking equity must do equity). SNET did not elicit these statements with "clean hands". SNET and SpecTran's calculating actions and their attempt to bootstrap SNET's claim of a sublicense prevent them from invoking the doctrine of equitable estoppel on the basis of Michaelson's statements.

Jaeger's inquiry, involving as it did only a limited amount of money, resulted in only a limited legal analysis on Michaelson's part. Thus, Michaelson's statements are not the type of "representation of existing fact" required to create an equitable estoppel. *See Hopwood Plays v. Kemper*, 263 N.Y. 380, 384–385, 189 N.E. 461 (1934) (inadvertent aquiescence does not give rise to estoppel); *see also, McAleenan v. Massachusetts Bonding & Insurance Co.*, 232 N.Y. 199, 206, 133 N.E. 444 (1921) (opinion does not become basis of an estoppel). Michaelson's statements were made in response to Jaeger's calculated inquiries. Therefore, SNET cannot now maintain that Michaelson or Corning performed any act upon which SNET can be said to have, in fact, relied or changed a position. *See Werking v. Amity Estates*, 2 N.Y.2d 43, 53, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956) *appeal dismissed*, 353 U.S. 933, 77 S.Ct. 812, 1 L.Ed.2d 756 (1957), *rehearing denied*, 353 U.S. 989, 77 S.Ct. 1281, 1 L.Ed.2d 1146.

Moreover, the evidence showed that SNET's decision to go forward with the joint venture did not hinge totally on Michaelson's statements or Corning's failure to respond. SNET had already made the decision to go ahead with the joint venture as of July 5, 1985, regardless of Corning's response. If Corning objected, SNET was ready to litigate its rights. Deposition Transcript of James Curtin, p. 467. Officials at SNET had already examined the 1970 and 1975 Western Agreements. SNET also elicited the opinion of counsel for AT & T concerning the existence of SNET's rights under these agreements. Finally, SNET consulted outside counsel in order to ascertain the scope of its rights. Thus, SNET did not innocently rely. *See Holm v. C.M.P. Sheet Metal*, 89 A.D.2d 229, 455 N.Y.S.2d 429. SNET's decision to go ahead with the joint venture, despite their appreciation of the possible risks in-

volved, reflected a consideration of many factors apart from Michaelson's statements.

SNET has also asserted an affirmative defense of acquiescence. This doctrine is substantially a variation of the equitable estoppel doctrine. As was noted in *Rothschild v. Title Guarantee and Trust Company,* 204 N.Y. 458, 464, 97 N.E. 879 (1912):

> When a party with full knowledge, or with sufficient notice of his rights and of *all the material facts,* freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable. (Emphasis added) (Citation omitted).

██ Michaelson's statements and Corning's failure to respond to Curtin's letter of July 5, 1985 did not constitute acquiescence. None of the officials at Corning had complete knowledge of all the material facts concerning the proposed joint venture. Michaelson could not be expected to undertake the extensive legal analysis necessary to determine the nature of SNET's rights in response to Jaeger's limited request for information. Soon after Corning learned of the joint venture, they made SNET aware of their position that SNET was without a sublicense in the optical fiber patents. Therefore, SNET's defense of acquiescence is similarly without merit.

Given my holding that SNET does not possess a valid sublicense to the Corning optical fiber patents, SNET's counterclaims for interference with business relationships and unfair competition are without merit. Corning had every right to inform the public, including prospective purchasers of SoneTran's products, that SNET was without the power to sublicense SoneTran to use the optical fiber patents.

## CONCLUSION

Corning's request for a declaratory judgment that SNET does not possess a subli-

cense for Corning's patents relating to optical communications systems, optical fiber devices, optical fiber interconnecting apparatus, and optical modulators, pursuant to the provisions of the 1975 Patent License Agreement between Western Electric Co., Inc. and Corning Glass Works, is hereby granted. SNET's counter-claims for interference with business relationships and unfair competition are denied.

The Clerk is directed to enter judgment in favor of the plaintiff pursuant to Fed.R. Civ.P. 58(2).

ALL OF THE ABOVE IS SO ORDERED.