UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, The Commission of La Cosa Nostra, Anthony Salerno, a/k/a "Fat Tony," Matthew Ianniello, a/k/a "Matty the Horse," Anthony Provenzano, a/k/a "Tony Pro," Nunzio Provenzano, a/k/a "Nunzi Pro," Anthony Corallo, a/k/a "Tony Ducks," Salvatore Santoro, a/k/a "Tom Mix," Christopher Furnari, Sr., a/k/a "Christie Tick," Frank Manzo, Carmine Persico, a/k/a "Junior," "The Snake," Gennaro Lan-

gella, a/k/a "Gerry Lang," Philip Rastelli, a/k/a "Rusty," Nicholas Marangello, a/k/a "Nicky Glasses," Joseph Massino, a/k/a "Joey Messina," Anthony Ficarotta, a/k/a "Figgy," Eugene Boffa, Sr., Francis Sheeran, Milton Rockman, a/k/a "Maishe," John Tronolone, a/k/a "Peanuts," Joseph John Aiuppa, a/k/a "Joey O'Brien," "Joe Doves," "Joey Aiuppa," John Phillip Cerone, a/k/a "Jackie the Lackie," "Jackie Cerone," Joseph Lombardo, a/k/a "Joey the Clown," Angelo Lapietra, a/k/a "The Nutcracker," Frank Balistrieri, a/k/a "Mr. B," Carl Angelo Deluna, a/k/a "Toughy," Carl Civella, a/k/a "Corky," Anthony Thomas Civella, a/k/a "Tony Ripe," General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Jackie Presser, General President, Weldon Mathis, General Secretary–Treasurer, Joseph Trerotola, a/k/a "Joe T," First Vice President, Robert Holmes, Sr., Second Vice President, William J. McCarthy, Third Vice President, Joseph W. Morgan, Fourth Vice President, Edward M. Lawson, Fifth Vice President, Arnold Weinmeister, Sixth Vice President, John H. Cleveland, Seventh Vice President, Maurice R. Schurr, Eighth Vice President, Donald Peters, Ninth Vice President, Walter J. Shea, Tenth Vice President, Harold Friedman, Eleventh Vice President, Jack D. Cox, Twelfth Vice President, Don L. West, Thirteenth Vice President, Michael J. Riley, Fourteenth Vice President, Theodore Cozza, Fifteenth Vice President, Daniel Ligurotis, Sixteenth Vice President, Salvatore Provenzano, a/k/a "Sammy Pro," Former Vice President, Defendants.

No. 88 CIV. 4486 (DNE).

United States District Court,
S.D. New York.

Oct. 27, 1992.

See also, 816 F.Supp. 852, 147 F.R.D. 24.

Otto G. Obermaier, U.S. Atty. for the S.D. of N.Y. (Peter C. Sprung, Christine H. Chung, of counsel), for U.S.

Williams & Wise, New Haven, CT, John R. Williams (Leon Friedman, New York City, of counsel), for respondents.

## OPINION & ORDER

EDELSTEIN, District Judge.

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court-Appointed Officers"). The election, which the Election Officer certified on January 22, 1992, resulted in Ronald C. Carey assuming the office of IBT General President. The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the electoral and disciplinary provisions.

### Background

The Government seeks to enforce a settlement of its civil contempt action against re-

spondents, who are current and former officers of Local 493, Kenneth Morrill, Frank Scopino, William Warner, Dennis Shippee, and Glen Lawton (the "respondent officers"), as well as their former attorney Burton Rosenberg (collectively, the "respondents"). The contempt proceedings stemmed from charges filed by the Investigations Officer against the respondent officers. At the time of the charges, respondents constituted the Executive Board of Local 493, located in Uncasville, Connecticut. The Investigations Officer charged respondents with bringing reproach upon the IBT by failing to perform their duties as union officers and by embezzling $107,273 in union funds for the use of a fellow officer, Philip Guarnaccia. Respondents provided Guarnaccia, the former Secretary–Treasurer of Local 493, with the $107,273 by granting him severance payments after he had been convicted of willfully failing to maintain accurate and complete union records, in violation of 29 U.S.C. §§ 1027 & 1131.[1]

This Court approved a settlement of the charges (the "Agreement") against respondents on January 17, 1991. Respondents agreed to reimburse Local 493 in the amount of $65,000 if Guarnaccia failed to honor his reimbursement obligation. They also agreed to "propose to and support before the [Local 493 Executive] Board and after its passage to the Local 493 membership" an amendment (the "Amendment") to the Local's bylaws and constitution concerning limits on the amount and type of permissible severance payments. In order to implement the provision calling for a membership vote on the Amendment, Local 493's bylaws and constitution required that respondents read the Amendment at two consecutive general membership meetings.

The Government alleges that respondents failed to honor the portion of the settlement compelling them to propose the Amendment to the general membership. A Local 493

---

[1.] Guarnaccia's conviction occurred on July 10, 1987. On November 5, 1990, the Investigations Officer charged Guarnaccia with bringing reproach upon the IBT by failing to perform duties as a union officer and by embezzling $107,273 in union funds. In a settlement of these charges, approved by this Court on January 16, 1991, Guarnaccia agreed to reimburse Local 493 in the amount of $65,000, to resign as a shop steward, and not to seek or accept election or appointment to union office for two years.

member, Mr. Donald Villa, informed the Government that at the first reading of the Amendment to the general membership, Mr. Morrill stated that "Carberry's office" wrote the Amendment and that "we have to read this and recommend it to you." *Declaration of Peter C. Sprung, Assistant United States Attorney (April 29, 1991)*, at 6, ¶ 10. Another Local 493 member, Mr. John Sarantopolous, allegedly informed the Government that at the second reading of the Amendment, Mr. Scopino stated that respondents had been forced to sign the Agreement and that while "we have to recommend the Amendment to you," the membership did not have to approve it. *Id.*, at ¶ 11. Both Mr. Villa and Mr. Sarantopolous concluded that respondents were encouraging the membership to reject the Amendment when it came up for a vote at a later meeting.

Mr. Sarantopolous informed the Government that at the third and final reading of the Amendment, which occurred on April 14, 1991, Mr. Rosenberg stated that respondents had not acted improperly and that they settled the charges under duress from the Independent Administrator. He supposedly added that the Amendment limited "the compensation of your officials when they leave office, when in fact you, the membership want to reward them with compensation and other items as you've done in the past." *Id.*, at 7, ¶ 12. Mr. Rosenberg concluded by urging the membership to reject the Amendment. Following Mr. Rosenberg's presentation, Mr. Morrill told the general membership that they were free to reject the amendment and then both Mr. Morrill and Mr. Scopino urged rejection of the Amendment. Mr. Scopino then tried to bring the Amendment to a vote without further discussion; Mr. Sarantopolous objected, however, and was allowed to speak in support of the Amendment, although several respondents allegedly attempted to shout him down as he spoke. The membership then voted to reject the proposed Amendment by a margin of 94 to 32; Mr. Sarantopolous represents that following the vote, several members stated that they would have voted for the Amendment had the vote been by secret ballot, but voted against it out of a fear of retaliation given the non-secret nature of the vote.

On the basis of declarations by Mr. Villa and Mr. Sarantopolous, the Government, on April 29, 1991, brought an order to show cause why respondents should not be held in contempt of the Agreement. This Court signed the order and scheduled an evidentiary hearing for May 2, 1991. At that hearing, however, the Government declined to submit evidence on the issue of contempt because the parties had reached a settlement, the terms of which were contained in a letter dated May 2, 1991 (the "Settlement"). The Settlement bound respondents to pass an Executive Board resolution adopting the Amendment, present it to the general membership for a secret-ballot vote, which the Government would supervise. Respondents also agreed never to receive severance pay in an amount greater than that set forth in the resolution, to terminate Mr. Rosenberg and his law firm with respect to all Local 493 matters and to reimburse the Local for fees paid to Mr. Rosenberg in connection with their disciplinary and contempt proceedings. Finally, respondents consented to pay the Government's costs and attorney's fees for the contempt proceeding and to include in the formal settlement of the contempt action an admission that they violated the Agreement. This Court ordered the parties to frame the letter agreement as an order. The following statements were then made by Mr. Edward T. Ferguson, III, Assistant United States Attorney, Mr. Marc Bogatin, former counsel for the respondent officers, and Mr. Jerome Tauber, former counsel for Mr. Rosenberg:

> Mr. Ferguson: I would like to get on the record a statement from counsel for both Mr. Rosenberg and counsel for the five executive board members here that they agree to the provisions set forth in the May 2nd, 1991 letter, to which your Honor referred, just so there is no mistake about that.

> Mr. Bogatin: Yes, your Honor. Marc Bogatin, for the five executive board members. On behalf of my client[s], I can state and I do represent to the court that the five board members do agree to the ... two page letter. I can state and do state for the court that my client[s], the five

board members, have authorized me to represent to the court that they agree to the terms of this two-page letter.

\* \* \* \* \* \*

Mr. Tauber: Yes, your Honor. I represent Mr. Rosenberg, and on his behalf, I also represent to the court that he has authorized me to state on the record that he agrees to the conditions of the settlement outlined in the letter of May 2nd, 1991.

*Transcript of May 2, 1991 Hearing,* at 15–16.

Following this Court's direction, the Government prepared a stipulation and order that embodied the terms of the Settlement. On May 17, 1991, Mr. Bogatin represented orally to Mr. Ferguson that the respondent officers were willing to resign as officers, which was not a term of the Agreement or the Settlement. Assistant United States Attorney Peter C. Sprung responded by letter dated February 25, 1992 with the terms upon which respondents' resignations would be an acceptable substitute for the terms of the Settlement. These terms included the appointment of a temporary trustee pending the election of new officers and the termination of Mr. Rosenberg and his firm. Mr. Sprung added that "[i]f these terms are unacceptable to your clients ... the Government will immediately apply to the Court to enforce the terms of the May 2 agreement." Letter from Peter C. Sprung, Assistant United States Attorney, to Marc Bogatin, former counsel for respondent officers (February 25, 1992) (on file in the Southern District of New York).

From March through June 1992, the Government and new counsel for all respondents, Mr. John R. Williams, negotiated the terms of a settlement of the contempt proceeding that centered on the respondents' resignations from Local 493 offices. During the course of these negotiations, respondents Warner, Shippee and Lawton resigned their positions. By letter dated June 19, 1992, Mr. Williams stated to Mr. Sprung that "I have reviewed your letter [of June 9, 1992] ... and believe we may have an agreement here." Letter of John R. Williams, counsel for respondents, to Peter C. Sprung, Assistant United States Attorney (June 19, 1992)

(on file in the Southern District of New York). Despite this representation, respondents refused to execute the stipulation sent to them by Mr. Sprung.

The Government then made this motion for entry of judgment enforcing the terms of the Settlement contained in the May 2, 1991 letter agreement. The gist of the motion is that by their conduct at the general membership meetings, respondents violated their obligation, contained in the Agreement, to support the Amendment. The Government also asserts that in failing to support the Amendment, Mr. Rosenberg, acting as the Executive Board members' agent and attorney, violated the Agreement. Respondents proffer several arguments in opposition to the Government's application. They contend that: (1) this Court lacks personal jurisdiction over respondents due to inadequate service of process; (2) the parties abandoned the Settlement by subsequently engaging in further negotiations; (3) laches bars the Government's application; (4) the attorneys who appeared on their behalf at May 2, 1991 hearing had no authority to enter into the Settlement; and (5) performance of the provisions of the Settlement calling for Executive Board action is impossible. This Court held a hearing on this matter on October 13, 1992, at which the parties presented their arguments. Noting that respondents Morrill and Scopino are nominees for Local 493 office in an election that had been scheduled for Sunday, October 18, 1992, this Court stayed the election pending resolution of this matter.

### *Discussion*

#### A. Inadequate Service of Process

Respondents contend that this Court lacks personal jurisdiction because they did not receive proper service of process. They claim that they appeared at the May 2, 1991 hearing in response to a telecopy sent to Mr. Rosenberg's office and not in response to valid service of process. Moreover, they claim that raising the issue now is appropriate given the absence of any responsive pleading in this matter. Raising such a defense implicates "the manner in which ser-

vice has been made and not ... the court's power to adjudicate [respondents'] rights and liabilities." *Santos v. State Farm Fire & Casualty Co.*, 902 F.2d 1092, 1095 (2d Cir. 1990) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1353, at 277 (2d ed. 1990)). Indeed, it is well settled "that the disciplinary and investigatory provisions of the Consent Decree are binding on non-signatory members of the IBT." August 27, 1990 Opinion & Order, 745 F.Supp. 908, 912 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); *see United States v. IBT*, 905 F.2d 610, 622–23 (2d Cir.1990); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991), *aff'd*, 978 F.2d 706 (2d Cir.1992).

▮▮▮ Thus, respondents' personal jurisdiction objection goes not to the Court's power, but to the adequacy of service of process. It is clear, however, that respondents waived any objection to the adequacy of service of process by failing to raise this issue at the May 2, 1991 hearing. "Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703, 102 S.Ct. 2099, 2105, 72 L.Ed.2d 492 (1982). One way to waive an objection to service of process or personal jurisdiction is through inaction. *See id.* at 704–05, 102 S.Ct. at 2105. Respondents' inaction is glaring. Respondents appeared before this Court for the May 2, 1991 contempt hearing, and, far from contesting the adequacy of service of process, through their attorneys assured the Court that they had reached a settlement with the Government. In fact, from the time of the hearing until respondents filed their memorandum of law in opposition to the Government's attempt to enforce the Settlement—over a year later—respondents did absolutely nothing to alert the Government to their objection to service of process. Such inaction constitutes a waiver of any objection they may have had to service of process. *See, e.g., Santos*, 902 F.2d at 1096 (waiver appropriate where defendant first raised defective service objection nearly two years after service was at-

tempted); *Datskow v. Teledyne*, 899 F.2d 1298, 1303 (2d Cir.) (even though faulty service of process defense was asserted in timely answer, defendant waived objection by participating in scheduling discovery and motion practice and attending conference with magistrate), *cert. denied*, 498 U.S. 854, 111 S.Ct. 149, 112 L.Ed.2d 116 (1990).

Moreover, a finding of waiver is hardly unjust in this case. Respondents are not being asked to defend themselves in a distant forum. *See, e.g., Datskow*, 899 F.2d at 1303 ("We would be slower to find waiver by a defendant wishing to contest whether it was obligated to defend in a distant court."). Nor can respondents claim that they lacked notice of the nature or subject of the contempt proceeding, given that it related to an alleged violation of their own Agreement, and they appeared at the contempt hearing having resolved the matter with the Government. *See, e.g., Drywall Tapers & Pointers, Local 1974 v. Local 530, Operative Plasters & Cement Masons Int'l Ass'n*, 889 F.2d 389, 394 (2d Cir.1989) (no denial of due process "[s]o long as the defendant had actual notice of the [civil] contempt proceedings"), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990).

## B. Abandonment of Settlement

▮▮▮ Respondents contend that negotiations with the Government after the May 2, 1991 hearing, concerning their offer to resign, reveals that the parties abandoned the Settlement. Such an argument is without merit. Abandonment of a contract requires mutual consent of the parties. *See S.S. Silberblatt, Inc. v. Seaboard Sur. Co.*, 417 F.2d 1043, 1054 (8th Cir.1969); *Armour & Co. v. Celic*, 294 F.2d 432, 435 (2d Cir.1961). Abandonment may be implied from the attendant circumstances and the conduct of the parties, but only if the parties' conduct is "positive, unequivocal and inconsistent with an intent to be further bound by the contract." *Armour*, 294 F.2d at 436; *see Alessandri v. April Indus.*, 934 F.2d 1, 2 (1st Cir.1991); *Anstalt v. FIA Ins. Co.*, 749 F.2d 175, 178 (3d Cir. 1984). "The termination of a contract is not presumed, and the burden of establishing it

rests upon the party who asserts it." *Armour,* 294 F.2d at 436.

■ It is clear that the parties did not abandon the May 2, 1991 settlement. After the hearing, respondents initiated further negotiations that would have altered the settlement presented at the hearing by, most importantly, having respondents agree to resign from the IBT. By a letter dated February 25, 1992, Mr. Sprung replied to respondents' proposal by reiterating the terms of the May 2, 1991 Settlement and also setting forth the terms for a settlement that included respondents' resignations. The Government added that it was "unwilling to delay resolution of this matter any longer," and that if the terms of a settlement that encompassed respondents' resignations were not acceptable or approved in two days, it "will immediately apply to the Court to enforce the terms of the May 2 agreement." Letter from Peter C. Sprung, Assistant United States Attorney, to Marc Bogatin, former counsel for respondent officers (February 25, 1992) (on file in the Southern District of New York). Thus, even while discussing a possible alternative settlement with counsel for respondents, who suggested such an alternative in the first place, the Government indicated a clear intent not to abandon the May 2, 1991 agreement. In his letter, Mr. Sprung restated the terms of the May 2, 1991 agreement, stated that respondents had "agreed to settle the civil contempt proceeding" on the terms "read into the record" on May 2, 1991, and reserved the right to enforce the agreement on those terms. Far from demonstrating abandonment, these statements reveal a positive and unequivocal intent *to enforce* the May 2, 1991 agreement.

## C. Laches

■ Respondents assert that because the Government did not provide them with acceptable terms of a settlement that included their resignation until nine months after the May 2, 1991 hearing, this enforcement action is barred by laches. "The existence of laches is a question addressed to the discretion of the trial court," which must consider the "equities of the parties." *Gardner v. Panama R.R. Co.,* 342 U.S. 29, 30–31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951). Laches bars a claim where it is clear that a plaintiff unreasonably delayed in initiating action and this delay prejudiced the defendant. *See Robins Island Preservation Fund, Inc. v. Southold Dev. Corp.,* 959 F.2d 409, 423 (2d Cir.1992). It is not necessary, however, to address the merits of respondents' laches argument. It is well settled that "[a]s a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest." *Nevada v. United States,* 463 U.S. 110, 141, 103 S.Ct. 2906, 2924, 77 L.Ed.2d 509 (1983) (quoting *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917)); *United States v. Summerlin,* 310 U.S. 414, 416–17, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940). The Government initiated this civil RICO action against the IBT in order to rid the Union of corrupt influences, which clearly serves the public interest. As an aspect of this larger suit, the Government brought disciplinary charges against respondents for misusing union funds. Such an action is in the interest of the rank-and-file of the Local and the public at large.

■ Moreover, respondents are precluded from raising the equitable defense of laches under the doctrine of unclean hands, which precludes the assertion of an equitable defense by a party guilty of misconduct. *See Grotrian, Helfferich, Schulz, Th. Steinweg, Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1343 (2d Cir.1975); *Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 135 (S.D.N.Y.1989). Respondents' hands, at the very least, could use some antiseptic. To appreciate respondents' audacity in proffering an equitable defense, it is necessary to view their laches argument in context. Rather than contesting the charges pending against them, which they were entitled to do under the Consent Decree, respondents voluntarily entered into the Agreement with the Investigations Officer. As respondents admitted at the May 2, 1991 hearing, they then violated the Agreement. Yet again, they agreed on a settlement of the violation of the Agreement. Even respondents do not dis-

pute that they did not comply with the Settlement. Now, in yet another effort to avoid compliance, respondents assert that the Settlement is invalid due to delay on the part of the Government—delay caused in large part by respondents' efforts to obtain a settlement on different terms than agreed to by the parties and presented to the Court on May 2, 1991. Respondents have shown over the course of these disciplinary proceedings that they do not consider it necessary to honor their agreements with the Government. Their brazenness in repudiating legitimate agreements is surpassed only by their disregard for the welfare of the members of their Local—as shown by their willingness as officers to violate the membership's trust by misappropriating union funds. At the very least, respondents' conduct constitutes unclean hands and thus precludes a viable laches defense.

### D. Attorney Authority to Enter Settlement

■ At the October 13, 1992 hearing in this matter, counsel for respondents, Mr. John R. Williams, asserted for the first time that the attorneys who represented respondents at the May 2, 1991 hearing had no authority to enter into the Settlement of the Government's contempt action. This argument is unavailing. Mr. Williams' correspondence since the May 2, 1991 hearing suggests the falsity of this argument. In his correspondence with the Government following the May 2, 1991 hearing, which was designed to reach an alternative to the May 2, 1991 accord, Mr. Williams never asserted the invalidity of the May 2, 1991 Settlement due to former counsels' lack of authority. Such an assertion was first made at the October 13, 1992 hearing. *See, e.g.,* Letter from John R. Williams, counsel for respondents, to Peter C. Sprung, Assistant United States Attorney (June 19, 1992) (on file in the Southern District of New York). As recently as August 11, 1992, Mr. Williams sent this Court a list of reasons for refusing to enforce the May 2, 1991 settlement, and yet failed to mention his position that the respondents' attorneys lacked authority to bind respondents. *See* Letter from John R. Williams, counsel for respondents, to Judge David N. Edelstein

(August 11, 1992) (on file in the Southern District of New York).

Respondents' argument is also belied by statements made at the May 2, 1991 hearing by their former attorneys, who stated in open court, in the presence of at least some of respondents, that they had authority to enter into the settlement. At the hearing, Mr. Bogatin stated that "I can state and do state for the court that my client[s], the five board members, have authorized me to represent to the court that they agree to the terms of this two-page letter." Mr. Tauber stated that "I also represent to the court that [Mr. Rosenberg] has authorized me to state on the record that he agrees to the conditions of the settlement outlined in the letter of May 2nd, 1991." *See Transcript of May 2, 1991 Hearing,* at 15–16.

■ Furthermore, even if the attorneys did not have actual authority to bind respondents, they clearly had apparent authority to enter into the Settlement. "If an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, a settlement will be upheld." *Janneh v. GAF Corp.,* 887 F.2d 432, 436 (2d Cir.1989), *cert. denied,* 498 U.S. 865, 111 S.Ct. 177, 112 L.Ed.2d 141 (1990); *see Fennell v. TLB Kent Co.,* 865 F.2d 498, 502 (2d Cir.1989); *International Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 55 (2d Cir.1979). Apparent authority exists when a principal is responsible for an agent's appearing to have authority and the injured third party relies on the agent's authority. *See Herbert Constr. Co. v. Continental Ins. Co.,* 931 F.2d 989, 996–97 (2d Cir.1991). On May 2, 1991, counsel for respondents stated on the record that they had authority to enter into the Settlement. Respondents had sent their counsel into court on May 2 to address the Government's contempt action, presumably knowing that a settlement had been reached and would be presented to the Court. In addition, at least some of respondents were present that day and their silence certainly helped to create the appearance of authority. Accordingly, even in the unlikely event that counsel lacked actual authority, they had apparent authority to enter into the settlement.

## E. Impossibility of Performance

Respondents assert that because three respondent officers are no longer members of the Executive Board of Local 493, compliance with the provisions of the Settlement that requires Executive Board action is impossible.[2] The Settlement requires the Executive Board to send notice to the membership of respondents' violation of the Agreement, submit the Executive Board's severance pay resolution to the general membership for a full vote, terminate Mr. Rosenberg and his law firm, and restrain from disciplining Mr. Villa and Mr. Sarantopolous.

Respondents impossibility defense is unavailing. Pursuant to their agreement with the Investigations Officer, respondents obligated the Executive Board to perform these tasks. They violated both that Agreement and the Settlement of the Government's contempt proceeding. Now, they seek to escape compliance with this settlement based on changed circumstances—they do not hold office any longer, which makes compliance impossible. It is true that enforcing the terms of the settlement is appropriate only if respondents have the power to comply. See Shillitani v. United States, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966); Schoenberg v. Shapolsky Publishers, Inc., 971 F.2d 926, 935 (2d Cir.1992); Badgley v. Santacroce, 800 F.2d 33, 36–37 (2d Cir.1986), cert. denied, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). The burden of proof, however, rests on the party seeking to assert an impossibility defense. See United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983); Donovan v. Sovereign Sec., Ltd., 726 F.2d 55, 59 (2nd Cir.1984).

Respondents have not met this burden; the resignations do not affect the Settlement's viability. "A settlement is a contract, and once entered into is binding and conclusive." Janneh, 887 F.2d at 436. In entering the Settlement, respondents did not simply bind themselves to the Agreement. On the date of the Settlement, respondents comprised the Executive Board, and thus, as agents of the Local they had actual authority to bind the Local to contracts. See, e.g., Kozera v. Westchester–Fairfield Chapter of Nat'l Elec. Contractors Ass'n, 909 F.2d 48, 54 (2d Cir.1990), cert. denied, 498 U.S. 1084, 111 S.Ct. 956, 112 L.Ed.2d 1044 (1991); NLRB v. Local 815, Int'l Bhd. of Teamsters, 290 F.2d 99, 103 (2d Cir.1961). By agreeing to a Settlement that required Executive Board action, respondents bound the Local to the settlement. That respondents no longer comprise a majority of the Executive Board is irrelevant.[3]

In addition, Local 493 is bound by the terms of the Consent Decree. See United States v. IBT, 964 F.2d 180, 183 (2d Cir.1992); United States v. IBT, 931 F.2d 177, 184–87 (2d Cir.1991). Thus, it is subject to this Court's orders implementing and interpreting the Consent Decree. This Court has held that in interpreting and implementing the Consent Decree, a guiding principle is that "by entering this compact, the parties committed to rid the IBT of La Cosa Nostra influence and corruption, and to maintain the IBT 'democratically, with integrity and for the sole benefit of its members.'" August 19, 1992 Opinion & Order, 803 F.Supp. 761, 778 (S.D.N.Y.1992) (quoting Consent Decree, at p. 2). The Agreement and the Settlement further these purposes. Several provisions give Local 493's Executive Board a role in providing the membership an opportunity to

2. Respondents Warner, Shippee and Lawton resigned their offices in March 1992. Respondents Morrill and Scopino, the current Secretary–Treasurer and President of Local 493, are running for reelection to these posts.

3. Even assuming that respondents lacked actual authority, respondents had apparent authority to make these decisions. See, e.g. Kozera, 909 F.2d at 54 (contract signed by union officers and third party enforceable by third party against membership of Local when third party had no reason to doubt authority of officers to bind membership); Local 815, 290 F.2d at 103 (same principle). In this case, the Government had absolutely no reason to question the authority of the officers to implement the terms of the settlement calling for Executive Board action. Indeed, respondents had the power to take the action in question. In contracting to take such action, respondents bound the Local and all its manifestations, including the Executive Board, however constituted, to that settlement.

vote on a severance pay package without fear of retaliation, which goes to the heart of democratic practices. Other provisions involving the Board's dealings with Mr. Rosenberg clearly implicate the goal of ridding the IBT of corrupt influences. In order to effectuate the Agreement and the Settlement, however, and thus further the Consent Decree's goals, it is necessary to compel Executive Board action.

 Finally, as a matter of policy, this Court is loathe to excuse respondents' blatant misconduct on the grounds of impossibility. In contract law, for example, the defense of impossibility is not available to one who created that impossibility or for one who did not take virtually every action within his or her power to perform. See Health–Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990); East River Sav. Bank v. Secretary of HUD, 702 F.Supp. 448, 460 (S.D.N.Y.1988). Respondents have demonstrated repeated bad faith in connection with this matter. They ceaselessly have disregarded their agreements as well as an order of this Court, and have attempted, successfully so far, to delay resolution of this matter. In sum, far from making every possible attempt to comply with the terms of the Settlement and the Agreement, which has been entered as an order of this Court, they have orchestrated the current "impossibility." Accordingly, if the provisions of the Agreement and the Settlement calling for Executive Board action ultimately are deemed unenforceable, this Court will entertain an order to show cause why respondents should not be held in criminal contempt. See, e.g., Schoenberg, 971 F.2d at 935 (quoting In re Marc Rich & Co., A.G., 736 F.2d 864, 866 (2d Cir.1984)) (" 'Individuals unable to comply, [with a court order] because of their own bad faith actions ... may be subject to criminal sanctions.' ").

### Conclusion

IT IS HEREBY ORDERED that the Government's motion to enforce the terms of the May 2, 1991 Settlement is granted; and

IT IS FURTHER ORDERED that enforcement of the Settlement is proper on the terms contained in the Government's proposed judgment, attached as Exhibit A and filed in the Southern District of New York; and

IT IS FURTHER ORDERED that the Executive Board of Local 493 shall submit to the Court and the Government an affidavit stating that they have complied with the notice provision of the Settlement, contained in Paragraph 2(c) of the Government's proposed judgment and attached as Exhibit A, and shall indicate in the affidavit the date of the mailing of such notice to the membership; and

IT IS FURTHER ORDERED that the stay of Local 493 elections shall be dissolved one week following the mailing of notice to the membership referred to in Paragraph 2(c) of the Government's proposed judgment and attached as Exhibit A.

SO ORDERED.

### EXHIBIT A

#### Judgment

WHEREAS, this Judgment arises out of a civil contempt proceeding brought on by Order to Show Cause issued by this Court on April 29, 1991, and directed to Kenneth Morrill, Frank Scopino, William Warner, Dennis Shippee, Glen Lawton and Burton Rosenberg (the "Respondents"); and

WHEREAS, the Respondents are current or former members of the Executive Board of General Teamsters, Chauffeurs and Warehousemen, Local No. 493 ("IBT Local 493"), a local union based in Uncasville, Connecticut and affiliated with defendant International Brotherhood of Teamsters ("the IBT"), and counsel for the Local. Kenneth Morrill is the Secretary–Treasurer of IBT Local 493; Frank Scopino is the President; William Warner is the former Vice–President; Dennis Shippee is the former recording Secretary; Glen Lawton is a former Trustee; and Burton Rosenberg is an attorney who has represented IBT Local 493 and is who licensed to practice in the State of Connecticut; and

WHEREAS, on November 5, 1990, Charles M. Carberry, the Investigations Officer appointed by this Court pursuant to the March 14, 1989 Order (the "Consent De-

cree") agreed to by the Government and the IBT, filed disciplinary charges against each of the Respondents except Rosenberg for violations of the IBT Constitution. At the time the charges were brought, Kenneth Morrill, Frank Scopino, William Warner, Dennis Shippee and Glen Lawton were Officers and comprised the membership of the Executive Board of IBT Local 493. The Investigations Officer charged each of the Respondents except Rosenberg with embezzling $107,273 in IBT Local 493 funds for the benefit of Philip Guarnaccia, a former Secretary–Treasurer of IBT Local 493. In 1987, Guarnaccia, while the Secretary–Treasurer of IBT Local 493, pleaded guilty to a federal criminal charge of willfully failing to keep and maintain accurate and complete benefit plan records. Guarnaccia's guilty plea arose out of a federal grand jury investigation into the looting of an IBT Local 493 health services and insurance plan. Guarnaccia resigned from his position as IBT Local 493 Secretary–Treasurer in December 1989; and

WHEREAS, the Investigations Officer specifically charged the Local 493 Officers with giving Guarnaccia $75,520 more than he should have received in severance pay, giving Guarnaccia $3,469 in vacation pay to which he was not entitled, transferring title to a union-owned car valued at $18,025 to Guarnaccia for one dollar, and using an additional $10,260 of IBT Local 493's money to buy Guarnaccia a watch; and

WHEREAS, on November 5, 1990, the Investigations Officer also filed a disciplinary charge against Guarnaccia for violations of the IBT Constitution based on his receipt of the improper post-retirement payments by the Local 493 Officers described above. A hearing on the charges against Guarnaccia and the Local 493 Officers before the Court-appointed Independent Administrator was scheduled for December 20, 1990. At that hearing, the Investigations Officer would have presented evidence in support of the charges against Guarnaccia and the Local 493 Officers; and

WHEREAS, on December 19, 1990, the day before the hearing, the Local 493 Officers and Guarnaccia reached settlements of the charges against them with the Investigations Officer. Guarnaccia agreed, among other things, to resign from his position as an IBT Local 493 shop steward, not to hold office in any IBT entity for two years, and to pay $65,000 to IBT Local 493. The Local 493 Officers agreed, among other things, to pay $65,000 to IBT Local 493 in the event that Guarnaccia failed to pay that sum. The Local 493 Officers also agreed to adopt, and to propose to the Local 493 membership and support its adoption of, a new severance pay policy, which would limit severance payments to paid officers of IBT Local 493 to an amount equal to five weeks' salary for the retiring officers; and

WHEREAS, the settlement of the Investigations Officer's disciplinary charges against the Local 493 Officers and Guarnaccia was embodied in an Affidavit and Agreement (the "Agreement"), which was signed by each of the Local 493 Officers and Guarnaccia on December 19, 1990, was agreed to by the Investigations Officer, was approved by the Independent Administrator, and, on January 17, 1991, was so ordered by this Court; and

WHEREAS, Rosenberg represented the Local 493 Officers in connection with the defense of the disciplinary charges against them, as well as the resolution of those charges embodied in the Agreement. Rosenberg was fully familiar with the terms of the Agreement and notarized the signatures of the Local 493 Officers on the Agreement; and

WHEREAS, the Government alleges that the Local 493 Officers violated the Agreement. They did not pass an Executive Board resolution adopting the new severance pay policy. When the proposed new severance pay policy was read to the IBT Local 493 membership at membership meetings on February 10, 1991 and March 10, 1991, the Local 493 Officers did not support the proposal and did not allow other members to express their support for the proposal to the membership. When the proposed new severance pay policy was presented to the IBT Local 493 membership for a vote at a membership meeting on April 14, 1991, the Local 493 Officers did not support the proposal and did not allow other members an adequate

opportunity to express their support for the proposal to the membership; and

WHEREAS, the Government alleges that the Local 493 Officers further violated the Agreement by inviting Rosenberg to address the membership at the April 14, 1991 membership meeting, even though Rosenberg was not a member of IBT Local 493 and had no right to attend the meeting. The Local 493 Officers knew that Rosenberg was not a member of IBT Local 493 and had no right to attend. The Local 493 Officers knew that Rosenberg would speak against the proposal at the meeting and made no effort to prevent or stop Rosenberg from doing so once the meeting began. Rosenberg spoke out against the proposal although its passage would have been in the best interests of the membership. IBT Local 493 members rejected the proposal; and

WHEREAS, on April 29, 1991, this Court, acting upon the Government's motion, issued an Order to Show Cause why the Respondents should not be held in civil contempt for violating the Agreement and sanctioned accordingly. Pursuant to Local Civil Rule 43(a) of this Court, the Order to Show Cause and supporting papers were served that day by facsimile on Rosenberg as attorney for the Local 493 Officers. On May 1, 1991, the return date of the Order to Show Cause, this Court scheduled an evidentiary hearing for May 2, 1991, and the Government was prepared to present evidence at that time; and

WHEREAS, at the commencement of the proceeding on May 2, 1991, counsel for the Government informed the Court that the Government and the Respondents had agreed on a resolution of the civil contempt proceeding and presented the Court with a letter agreement dated May 2, 1991 summarizing the principal terms of the resolution. After each party to stated its consent to the terms of the letter agreement on the record, the Court adjourned the evidentiary hearing to allow counsel for the Government and the Respondents to prepare a proposed Stipulation and Order for the Court's consideration; and

WHEREAS, on May 2, 1991, Morrill, Scopino, Warner, Shippee and Lawton, as the five members of the Executive Board of IBT Local 493, were authorized and empowered to bind IBT Local 493 and future Executive Boards of IBT Local 493 by contract; and

WHEREAS, on May 2, 1991, the IBT Local 493 Executive Board enacted the following resolution setting a new severance pay policy (the "Severance Pay Resolution") for the Local:

(a) Upon the termination of employment by Local 493, severance payments to paid officers shall be calculated as follows:

| Years of Service | Severance |
| --- | --- |
| 1 year | 1 week's salary |
| 2–4 years | 2 weeks' salary |
| 5–9 years | 3 weeks' salary |
| 10–19 years | 4 weeks' salary |
| 20 years or more | 5 weeks' salary |

Severance payments shall not exceed these amounts. No severance payments shall be made to officers terminated for cause, or required to leave office by operation of law.

(b) Other than severance as specified in (a) above, no paid officer, upon termination of employment by Local 493, shall receive any other benefit, including but not limited to automobiles or gifts of any kind, except that a plaque or other token of appreciation, the value of which may not exceed $150, may be given to a departing officer; and

WHEREAS, on March 12, 1992, William Warner and Dennis Shippee resigned their positions as officers of IBT Local 493; and

WHEREAS, on March 16, 1992, Glen Lawton resigned his position as an officer of IBT Local 493; and

WHEREAS, the parties have not settled upon a formal stipulation and order memorializing the written agreement reported to the Court on May 2, 1992. Now, therefore,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. *Jurisdiction.* This Court has jurisdiction over the subject matter of this action. By appearing at the evidentiary hearing of May 2, 1991, Respondents waived any objec-

tions they may otherwise have had with respect to personal jurisdiction.

2. *Injunction.*

a. Respondents Morrill and Scopino will submit the Severance Pay Resolution enacted by the Executive Board on May 2, 1991 to the membership of IBT Local 493 for a vote. In accordance with Section 29 of the By-laws of IBT Local 493, the Severance Pay Resolution will be submitted at the next membership meeting and read at two consecutive regular meetings of the membership.

b. The membership vote on the Severance Pay Resolution will be by secret ballot in a mail referendum conducted at the expense of IBT Local 493. The referendum will be conducted by an entity chosen by the Government, at a time chosen by that entity.

c. The Executive Board of IBT Local 493 shall mail at some time before the ballots are mailed, a signed notice substantially in the form annexed as Exhibit A.

d. The Respondents shall have nothing to do with the conduct of the referendum, but may to observe the vote count. The Respondents shall not cause or induce anyone to oppose the Severance Pay Resolution. Pursuant to Section 29(B) of the By-laws of IBT Local 493, if two-thirds of the eligible members voting approve the Severance Pay Resolution, the Resolution shall be incorporated into the By–Laws, subject to the approval of the IBT General President in accordance with the IBT Constitution.

e. Regardless of the result of the membership vote on the Severance Pay Resolution, respondents Morrill, Scopino, Warner, Shippee and Walton will not receive severance pay greater than what is permitted by the Severance Pay Resolution. If Respondents Warner, Shippee and Lawton have received severance pay in excess of payments permitted by the resolution of May 2, 1991, they will return excess amounts to the treasury of IBT Local 493.

f. Within thirty days of the date of this Judgment, the IBT Local 493 Executive Board shall terminate Rosenberg and his firm, the Law Offices of Norman Zolot and Burton S. Rosenberg (the "Zolot/Rosenberg firm"), with respect to all IBT Local 493 matters. During the thirty day period, the Executive Board may not retain Rosenberg or the Zolot/Rosenberg firm on any new or additional matters. IBT Local 493 Board members shall exercise all powers they have as trustees of any pension, health, welfare or other benefit funds affiliated with IBT Local 493 to terminate Rosenberg and the Zolot/Rosenberg firm with respect to all matters involving those benefit funds. IBT Local 493 and its Executive Board are hereby permanently enjoined from retaining Rosenberg or the Zolot/Rosenberg firm with respect to any matters involving IBT Local 493 or any of its affiliated benefit funds.

g. Within thirty-two days of the date of this Judgment, Kenneth Morrill and Frank Scopino shall provide to the Independent Administrator, the Investigations Officer, and the Government a certified copy of a letter of termination from the IBT Local 493 Executive Board to Rosenberg and the Zolot/Rosenberg firm, and a sworn affidavit of compliance with the requirements of this paragraph.

h. If the thirty-day period provided in paragraph (f) above poses a hardship to IBT Local 493 as to any specific legal matter, the period may be extended by stipulation between the Government and IBT Local 493. Any such stipulation will be subject to this Court's approval.

i. Within forty-eight hours of the signing of this Judgment by the Court, Kenneth Morrill and Frank Scopino shall provide to the Independent Administrator, the Investigations Officer, and the Government a sworn affidavit that Philip Guarnaccia has been terminated from any and all employment by IBT Local 493.

j. The Executive Board members shall not cause IBT Local 493 members John Sarantopolous and Donald Villa to be fined, suspended, expelled or otherwise disciplined by IBT Local 493 on account of their cooperation with the Government in this civil contempt proceeding, or against any IBT Local 493 member on account of

any statements made or to be made, or votes cast or to be cast, concerning the Severance Pay Resolution.

k. The Respondents are jointly and severally liable to reimburse, and by no later than seven days after the date this Judgment is approved by this Court they shall reimburse, the treasury of IBT Local 493 for all money paid to Rosenberg or the Zolot/Rosenberg firm in connection with this civil contempt proceeding and the disciplinary proceeding against the Respondents. The IBT Local 493 Executive Board is hereby enjoined from causing IBT Local 493 to pay any additional such money. By no later than seven days from the date of this Judgment, Kenneth Morrill and Frank Scopino shall provide the following to the Independent Administrator, the Investigations Officer, and the Government: (a) certified copies of all bills received from and records of payments to Rosenberg or the Zolot/Rosenberg firm in connection with this civil contempt proceeding and the disciplinary proceeding against the Respondents; (b) certified copies of the payments required by this paragraph; and (c) a sworn affidavit of compliance with the requirements of this paragraph.

3. *Attorneys' Fees.* The Respondents shall be jointly and severally liable to pay, by no later than fourteen days after the date of this Judgment, from their personal funds, the sum of $12,500, which represents the Government's attorney fees in connection with this civil contempt proceeding. The Respondents shall pay this sum into the treasury of IBT Local 493, to defray the cost of the membership referendum. The Respondents are also jointly and severally liable to pay, by no later than fourteen days after the date of this Judgment, the sum of $1,000 to the Government to cover the expenses of the Government's witnesses in connection with this proceeding. By no later than fourteen days after the date of this Judgment, the Respondents shall provide to the Investigations Officer and the Government certified copies of the payments required by this paragraph and

a sworn affidavit of compliance with this paragraph.

4. *Scope of Judgment.* This Judgment resolves only the proceeding initiated by this Court's April 29, 1991 Order to Show Cause and does not otherwise limit the Government or affect the rights and powers of any other person or entity with respect to the Respondents, including any of the officers appointed by this Court pursuant to the Consent Decree.

## EXHIBIT A

### NOTICE TO THE MEMBERSHIP OF LOCAL 493

You will be receiving under separate cover a proposed amendment to the Bylaws of Local 493. This proposed amendment would limit the amount of the members' money that can be spent on severance payments for officers and employees to a maximum of five weeks salary. We, the undersigned members and former members of the Local 493 Executive Board, recommend that you vote in favor of this proposal.

This amendment was first proposed for a vote at a general membership meeting held on April 14, 1991, where it was voted down. We did not conduct the meeting properly. Our attorney, Burton Rosenberg, spoke against the amendment, although he was not a member of the Local. Members who supported the amendment were not given a fair chance to express their views.

To allow all of the members to vote on this proposal freely, the Executive Board of Local 493 is proposing it again. This time, the vote will be conducted by a secret ballot and in a mail referendum under government supervision. Your votes will be anonymous. No one will know, or be able to find out how you voted. No one will be permitted to retaliate against you for how you vote or what you say about this proposal.

As some of you may know, we were charged by the Investigations Officer with breaches of our fiduciary duties as officers for using the Local's money without your permission to give severance pay and gifts to Philip Guarnaccia, who had previously been convicted of a criminal offense involving the

abuse of his union office. The charges were scheduled for a hearing before Judge Lacey, the Independent Administrator, on December 20, 1990. At the hearing, the Investigations Officer would have introduced evidence against us. Rather than face a hearing, we agreed to settle the charges against us in a sworn Agreement we all signed on December 19, 1990. A copy of our agreement, which includes a copy of the charges, is enclosed.

As part of the settlement, Philip Guarnaccia agreed to pay $65,000 to the Local treasury. We agreed that, if he did not pay the money back, we would pay it back. As part of the settlement, we also agreed to propose and to support the passage of an amendment to the local 493 Bylaws. The purpose of the amendment was to ensure that excessive severance payments would no longer be paid to officers and employees. The amendment limited the severance pay officers could receive to a maximum of five weeks salary. It also prohibited the payment of any severance to any officer who was terminated for cause or by operation of law, such as by criminal conviction.

We agreed in the December settlement to pass an Executive Board resolution limiting the severance pay we could receive. We also agreed to recommend and support the adoption of the amendment, so that the members would have this protection of their money built into our Bylaws. As added protection, we agreed that any proposed change in the amendment would have to be done by secret ballot, so the members could vote freely.

We violated our agreement. While members of the Executive Board, we did not pass the Executive Board resolution that we agreed to pass. When the amendment was proposed for a vote at the meeting held on April 14, 1991, we did not support its passage, as we had agreed. Our attorney, Burton Rosenberg, spoke out against the agreement at the meeting, although its passage would have been in the interest of the members. At the April 14 meeting, and other meetings were the proposal was read, we did not allow other members who supported the proposal to express their views to the membership. This was wrong of us. Our violation of the settlement agreement caused us to spend more of the Local's money on legal fees. We will repay all such money to the Local's treasury to reimburse the Local for that expense. Mr. Rosenberg has been fired as counsel for the Local.

The proposed amendment that you will consider would save Local 493 money. It would allow for reasonable severance payments to officers and other employees who deserve them, but would ensure that excessive severance payments are not given. The provision prohibiting any severance payment to officers and employees removed for cause would ensure that your money is not given away to officers and employees who do not deserve it such as officers who steal from you. Under the Bylaws as they now stand, even an officer who is criminally convicted of stealing from you could receive generous severance pay. We strongly urge you to vote FOR passage of the proposed amendment to the Local 493 Bylaws.

Frank Scopino

William Warner

Dennis Shippee

Kenneth Morrill

Glen Lawton

Dated: